**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ERNEST CRAIGHEAD,
        *Defendant-Appellant.*

No. 07-10135

D.C. No.
CR-04-02351-JMR

OPINION

Appeal from the United States District Court
for the District of Arizona
John M. Roll, District Judge, Presiding

Argued and Submitted
February 12, 2008—San Francisco, California

Filed August 21, 2008

Before: Sidney R. Thomas and Jay S. Bybee, Circuit Judges,
and Frederic Block,* Senior District Judge.

Opinion by Judge Bybee

*The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

11325

**COUNSEL**

Celeste Corlett, Assistant United States Attorney, United States Attorney for the District of Arizona, Tucson, Arizona, for plaintiffs-appellee.

Steven D. West, Tucson, Arizona, for the defendant-appellant.

**OPINION**

BYBEE, Circuit Judge:

The home occupies a special place in the pantheon of constitutional rights. Under the First Amendment, the "State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). The Second Amendment prohibits a federal "ban on handgun possession in the home." *District of Columbia v. Heller*, 554 U.S. ___, ___ (2008), slip op. 64. The Third Amendment forbids quartering soldiers "in any house" in time of peace "without the consent of the Owner." U.S. CONST. amend. III. The Fourth Amendment protects us against unreasonable searches or seizures in our "persons, houses, papers, and effects." *Id.* amend. IV. The question presented in this case is one of first impression in our court: under what circumstances under the Fifth Amendment does an interrogation by law enforcement officers in the suspect's own home turn the home into such a police-dominated atmosphere that the interrogation becomes custodial in nature and requires *Miranda* warnings?

Appellant Ernest D. Craighead appeals his conviction following entry of a conditional guilty plea for transportation,

shipping, and possession of child pornography. A search of Craighead's home computer system revealed numerous movies and images depicting child pornography. On appeal, as his plea agreement permits, he renews his argument that he is entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), because the affidavit used to obtain the warrant for this search depended on misleading statements and omissions. Craighead also renews his argument that his confession to having downloaded and stored child pornography on his computer system should be suppressed because the interrogation in his home was custodial and he was not read his *Miranda* rights.

We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's ruling that Craighead was not entitled to a *Franks* hearing because Craighead did not properly allege that any specific portion of the warrant was actually false or misleading. On the *Miranda* question, we reverse the district court's ruling that the interrogation in Craighead's home was not custodial and that *Miranda* warnings were not required. Craighead's self-incriminating statements should have been suppressed. We remand for further proceedings.

I

A

Craighead first came to the FBI's attention in 2004. At that time, Craighead was an electronic warfare technician in the U.S. Air Force. On July 13, Special Agent Robin Andrews ("SA Andrews"), a seventeen-year FBI veteran, logged onto the LimeWire peer-to-peer file-sharing network to conduct undercover surveillance of child pornography distribution. Using LimeWire, SA Andrews entered a search term that she knew was associated with graphic files depicting child pornography. Her search revealed that a computer using IP address 68.0.185.111 was sharing files that, by their titles, appeared related to child pornography. SA Andrews down-

loaded two of these images, and confirmed that they depicted prepubescent females in sexually explicit positions. She attempted to download a third image but received the message, "Waiting for Busy Host." SA Andrews knew from experience that this message indicates that the server will not permit the download because demand for the image has overloaded its capacity to supply it.

Using a publicly-accessible online database, SA Andrews determined that IP address 68.0.185.111 was owned by Cox Communications. By administrative subpoena to Cox Communications, SA Andrews learned that IP address 68.0.185.111 was assigned to Ernest Craighead's residence in base housing on Davis-Monthan Air Force Base in Tucson, Arizona. The subpoena listed Craighead's address and telephone number. SA Andrews then corroborated the name, address, and telephone number by running a driver's licence check, querying the County Clerk's Office, and contacting the Air Force Office of Special Investigations ("OSI"). On July 26, 2004, SA Andrews swore out an affidavit for a search warrant. The warrant was authorized the same day by Magistrate Judge Glenda Edmonds.

The search warrant for Craighead's residence on the Air Force base was executed at approximately 8:40 A.M. on July 27, 2004. Eight law enforcement officers, representing three different agencies, went to Craighead's residence: five FBI agents, a detective from the Pima County Sheriff's Department, and two members from the OSI. All of these law enforcement officers were armed; some of them unholstered their firearms in Craighead's presence during the search. All of the FBI agents were wearing flak jackets or "raid vests." Two non-agents accompanied the law enforcement officers: an FBI evidence control clerk, and Air Force Sergeant Mike Ramsey, who the government later represented was present for Craighead's "emotional support."

At the hearing on Craighead's motion to suppress, SA Andrews testified that while other officers executed the search warrant, she introduced herself to Craighead as Robin Andrews from the FBI. She also introduced Jeff Englander, the detective from Pima County. She told Craighead that the two of them would like to talk with him about the search warrant. She told him that he was not under arrest, that any statement he might make would be voluntary, and that he would not be arrested that day regardless of what information he provided. SA Andrews also testified that she told Craighead that he was free to leave.[1]

SA Andrews and Detective Englander then directed Craighead to a storage room at the back of his house, "where [they] could have a private conversation." SA Andrews did not handcuff Craighead at any point while escorting him to the storage room nor during the interview that followed. As SA Andrews described the storage room, it was cluttered with boxes. She could not recall whether Craighead sat on a box, or whether he sat on a chair grabbed from the kitchen. SA Andrews squatted on the ground, taking notes. Detective Englander stood leaning against the wall near the exit, with his back to the door. Detective Englander wore a flak jacket and a sidearm. SA Andrews testified that they shut the door "for privacy." Although Sergeant Ramsey had ostensibly been brought along to provide emotional support for Craighead, he was not permitted to accompany Craighead into the storage room. SA Andrews testified that this was because he was "non-law enforcement" and therefore would "never" be permitted to be present during an FBI interview.

The interview lasted approximately twenty to thirty minutes. SA Andrews testified that it was her practice to tell interviewees that they are "free to leave" at the beginning of each

---

[1]Craighead denied that he was told he was free to leave. The district court, however, found SA Andrews' testimony credible, and thus found that SA Andrews did tell Craighead he was free to leave.

interview, even if she has already told them this when escorting them to the interview location. However, she could not recall whether she actually repeated this statement to Craighead after they entered the back storage room and she closed the door. During the interview, SA Andrews did not make any threats or promises to induce Craighead to speak. She did not use any force. She did not read Craighead the *Miranda* warnings.

Craighead testified that he felt that he was not free to leave because he "would have either had to have moved [Detective Englander] or asked him to move." He also testified that the "prevailing mood of the morning" left him with the impression that he was not free to leave. He knew there were members of three different law enforcement agencies present in his home: the FBI, the Pima County Sheriff's Department, and the Air Force OSI. He believed that even if SA Andrews permitted him to leave, members of the other two law enforcement agencies would not. He was concerned that the agencies had not coordinated and so members of the other agencies might not know that SA Andrews had authorized him to leave. Similarly, he was unsure if he needed permission from all three agencies to leave, or if the Air Force investigators believed that he needed such permission.

Craighead also testified that he was unaware during the interview that Sergeant Ramsey had been invited to provide emotional support. Rather, as Craighead explained, Sergeant Ramsey was his "first sergeant," a superior with authority over him. Craighead assumed Sergeant Ramsey was required to be there by Air Force regulation. It was not until after everyone had left his house that he had a moment to speak with Sergeant Ramsey and discover the reason for Sergeant Ramsey's presence.

During the interview, Craighead admitted that he downloaded child pornography using LimeWire, that he stored child pornography on his computer, and that he had saved

some to a disk. Craighead was not arrested at the end of the interview. He was never arrested at any time prior to his conviction; he appeared in court by summons only.

The search resulted in the seizure of the hard drive and loose storage media (compact discs and 3.5-inch floppy diskettes) from Craighead's computer. The FBI computer forensics expert located sixteen movies of various lengths depicting child pornography on the hard drive of Craighead's computer. The movies were found in a folder titled "PTHC," which the FBI expert testified based on his experience stands for "Pre-Teen Hard Core." The loose storage media contained fifteen images and three movies depicting child pornography. The two files that SA Andrews had downloaded on July 13, 2004, were not located on Craighead's computer. The FBI expert was able to locate on the computer multiple exact references to the file name of the first file downloaded by the FBI—a file name consisting of a long string of explicit words related to child pornography. Neither the image itself nor references to the file name of the second file were located.

## B

In November 2004, Craighead was indicted for Transportation and Shipping of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and (b)(1); and Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2).

In February 2006, Craighead filed a Motion to Suppress Evidence Illegally Seized, arguing that he was entitled to a *Franks* hearing because SA Andrews' search warrant affidavit contained false and unreliable information. Oral argument on the motion was held on April 6, 2006 and again on July 6, 2006. Craighead's claim was based on the fact that SA Andrews observed that the files named in her warrant affidavit were available from a computer at Craighead's IP address, yet these particular files were never found on Craighead's

computer system. Craighead's claim was that someone else could have hacked into his computer and downloaded the named files. Craighead provided an affidavit by his forensic computer expert, Tami Loerhs, which provided general information regarding the widespread risks of computer hacking, IP spoofing, internet hijacking, and internet theft. Loerhs averred that she had performed an examination of Craighead's computer, and could not locate the two downloaded files.

The district court denied the request for a *Franks* hearing, ruling that Craighead did not satisfy his burden of proof as to any alleged falseness in SA Andrews' affidavit. The court reasoned that the theory that someone had hacked into Craighead's computer, even if credible, would be relevant to Craighead's guilt or innocence of the criminal charges, not to the truthfulness of SA Andrews' affidavit.

On the same day that Craighead filed his motion for a *Franks* hearing, he also filed a Motion to Suppress Statements Taken in Violation of *Miranda*. After hearing testimony and oral argument, the district court held that the interrogation in Craighead's home was not custodial and therefore that *Miranda* warnings were not required.

On August 7, 2006, Craighead entered a conditional guilty plea to both counts in the indictment, while preserving the right to appeal his *Franks* claim and his *Miranda* claim. Craighead was sentenced to 78 months' imprisonment, followed by a term of supervised release for life.

II

**[1]** We first consider Craighead's claim that the district court erroneously denied him an evidentiary hearing under *Franks* when Craighead alleged falsity in the affidavit used to secure a search warrant for his house. A defendant is entitled to an evidentiary hearing if he "makes a substantial preliminary showing that a false statement knowingly and intention-

ally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof. *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983). We review a district court's refusal to conduct a *Franks* hearing *de novo*. *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004).

**[2]** We affirm the district court's denial of a *Franks* hearing on the ground that Craighead failed to properly allege anything that was false or misleading in SA Andrews' affidavit.[2] *See* 438 U.S. at 171. Craighead first points to SA Andrews' statement in paragraph 32 of the affidavit that "[t]wo files from IP address 68.0.185.11 were downloaded by your affiant." He contends that this statement impermissibly suggests that the files were downloaded from his computer, when they were never located on his computer. Craighead's claim lacks merit because the statement does not suggest that the files were downloaded from his computer. The statement communicates only that SA Andrews downloaded two files that were listed as available for download from IP address 68.0.185.111. SA Andrews does not aver that the files were found on Craighead's computer.

**[3]** Craighead next argues that SA Andrews impermissibly omitted any statements from her affidavit relating to IP spoof-

---

[2]We assume for purposes of this appeal that Craighead is correct that the district court erroneously considered Craighead's confession and the fact that child pornography was eventually found on Craighead's computer as a basis for denying the *Franks* hearing. We assume without deciding that the evidence obtained from a fruitful search may not be used to cure an affidavit based on deliberately or recklessly false or misleading statements. We may affirm the district court's judgment on any ground the record supports, *United States v. Lehman*, 792 F.2d 899, 901 (9th Cir. 1986), and therefore we affirm for the reasons stated above.

ing, internet hijacking, and internet theory. His theory, apparently, is that had SA Andrews included this information, the magistrate judge would have understood the possibility that, despite the IP address connection, the files may not have originated on Craighead's computer. It is true that "deliberate or reckless omissions of facts that tend to mislead" can be grounds for a *Franks* hearing. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). However, the omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search. SA Andrews did not commit a misleading omission by failing to omit from her affidavit general knowledge about computer hacking that might support how, hypothetically, Craighead may not have downloaded to his own computer the files that SA Andrews downloaded from Craighead's IP address. *See United States v. Kelley*, 482 F.3d 1047, 1053 (9th Cir. 2007) (holding that an affidavit's failure to raise the possibility that emails containing child pornography could have been unsolicited spam was not a misleading omission); *cf. United States v. Hay*, 231 F.3d 630, 638 (9th Cir. 2000) (holding that a district court's failure to consider theories such as spamming or automated bulk downloading that might support the unlikely possibility that the suspect did not actually transmit 19 images of child pornography himself did not constitute error in a probable cause determination).

[4] Finally, Craighead points to SA Andrews' statements about what files were available to download via LimeWire and which files were actually downloaded. In paragraph 32 of the warrant affidavit, SA Andrews stated that she ran a search and "viewed the results of the search and observed multiple files available to be viewed and downloaded by others at IP address 68.0.185.111" and that she downloaded two of these files. In paragraph 33, SA Andrews stated that "[n]umerous other files were also available for downloading from IP address 68.0.185.111" and then listed seven of those file-

names as a "sampling." Craighead argues that SA Andrews impermissibly failed to state that the filenames shown in paragraph 33 were merely text in a search results window and that it was not possible to know whether these files actually existed unless SA Andrews had successfully downloaded them. This argument lacks merit. SA Andrews' statements in these two paragraphs communicate only that her search indicated that numerous files were available for download from the listed IP address. None of SA Andrews' statements in paragraphs 32 and 33 amount to an averment, express or implied, that she knew that all of the files whose names appeared in the search results window actually existed on Craighead's computer. On the contrary, in paragraph 34, SA Andrews expressly stated that she attempted to download one of the files listed in paragraph 33 but was unable to do so because the server was overloaded. Nowhere did she indicate that she had attempted to download or otherwise verify the location of the other files whose names she listed in paragraph 33.

**[5]** Craighead did not point to one specific statement in the affidavit that was false or misleading. Therefore, he did not meet his burden to demonstrate cause for a *Franks* hearing. Because he failed to allege a false or misleading statement, we do not reach the issues of whether these statements were made intentionally or with reckless disregard for the truth or whether they were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 155-56; *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000). We affirm the district court's denial of a *Franks* hearing.

### III

We turn to Craighead's claim that the district court erroneously denied his motion to suppress on the ground that Craighead was not given the *Miranda* warnings to which he was entitled. We review a denial of a motion to suppress and whether a defendant is constitutionally entitled to *Miranda*

warnings *de novo*. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). We review the underlying factual findings for clear error. *Id*. Where testimony is taken, we give special deference to the district court's credibility determinations. *See United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir. 1998).

A

[6] The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444-45 (1966). These protections are constitutional in nature. *See Dickerson v. United States*, 530 U.S. 428 (2000). The parties agree that Craighead was interrogated but not given *Miranda* warnings. Therefore, the only issue before us is whether Craighead was in custody at the time of his interrogation.

In cases such as this in which the suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way." 384 U.S. at 444. To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). We then ask whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n.35 (1984). Accordingly, taking into account the totality of the circumstances, we must decide whether a reasonable person in Craighead's position would have felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation.

Applying this standard to an interrogation conducted within the home presents some analytical challenges, however, and presents an issue on which our court thus far has said little. The usual inquiry into whether the suspect reasonably believed he could "leave" the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home. "Home," said Robert Frost, "is the place where, when you go there, they have to take you in." Robert Frost, The Death of the Hired Man, *in* THE POETRY OF ROBERT FROST 38 (Edward C. Latham ed., 1967). If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home. *Cf. Crawford*, 372 F.3d at 1060 (holding that an interrogation at an FBI office was not custodial because, *inter alia*, the defendant was told he was free to leave and "was, in fact, returned home at the end of the interview"). Similarly, a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free "to terminate the interrogation" if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search. We must, therefore, consider how to apply the traditional *Miranda* inquiry to an in-home interrogation.

**[7]** An interrogation conducted within the suspect's home is not *per se* custodial. *See Beckwith v. United States*, 425 U.S. 341, 342-43, 347 (1976). On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature. *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994); 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.6(e) (3d ed. 2007). The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar sur-

roundings. *See Orozco v. Texas*, 394 U.S. 324, 326 (1969). Nevertheless, an interrogation in the suspect's home may be found to be custodial under certain circumstances. *See id.* at 325-26 (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned).

**[8]** *Miranda* held that warnings were required when the person being interrogated was "in custody at the station or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 477 (1966). The Court held that certain essential salient features made situations in which the suspect was "otherwise deprived of his freedom of action" similar to those in which the suspect was taken into custody at the police station, *id.*, specifically, "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445 (stating that the salient feature was that the suspect was "cut off from the outside world"). Drawing on this reasoning, when applying *Miranda* to the task of sorting a non-custodial in-home interrogation from a custodial one, our analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a "police-dominated atmosphere."

Our approach of using the "police-dominated atmosphere" as the benchmark for custodial interrogations in locations outside of the police station is consistent with the Supreme Court's adaptations of *Miranda* to these types of locations. *See Berkemer*, 468 U.S. at 438-39 (holding that *Miranda* warnings are not required at an ordinary traffic stop because the atmosphere there "is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself"). This approach has also been taken by our sister circuits that have considered whether an in-home interrogation was "custodial" under *Miranda*. *See, e.g.*, *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (con-

cluding that the suspect's home had become a "police-dominated environment" because "the facts belie any conclusion that [the suspect's] home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning."); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding suspect was in custody although interrogated in his home because of the "level of physical control that the agents exercised over" the suspect); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the suspect] was being held is the degree to which the police dominated the scene."); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting.").

B

**[9]** The determination of whether an in-home interrogation was custodial "is necessarily fact intensive." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). Although our opinion today "should not be interpreted as an exhaustive pronouncement," *id.*, reviewing the facts of Craighead's case and the relevant factors identified by our sister circuits, we conclude that several factors are relevant to whether the circumstances of Craighead's interrogation effected a police-dominated atmosphere: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.[3] We address each factor in turn.

---

[3]Other circuits have identified various lists of relevant factors for determining when an in-home interrogation is custodial. *See, e.g.*, *Revels*, 510

1

**[10]** First, we consider the number of law enforcement personnel and whether they were armed. When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. In addition, if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force. In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere. *See Mittel-Carey*, 493 F.3d at 38, 40 (finding that the presence of eight officers in the home, one of whom unholstered his gun, contributed to a police-dominated environ-

_____

F.3d at 1275 (listing: whether the atmosphere was police dominated; whether the nature and length of the officers' questioning was accusatory or coercive; and whether the suspect was informed that statements were voluntary and she was free to leave); *Mittel-Carey*, 493 F.3d at 39 (listing: whether the suspect was questioned in familiar surroundings; the number of law enforcement officers present; whether the suspect was restrained; and the character of the interrogation); *Sprosty*, 79 F.3d at 641 (listing: whether "and to what extent" the suspect was informed that questioning was voluntary; whether police have employed subterfuge; the degree to which the interrogation is "police dominated"; whether the suspect was restrained; whether the suspect could reasonably believe he could terminate the interrogation and leave); *Griffin*, 922 F.2d at 1348-49 (listing: purpose, place, and length of interrogation; whether the suspect was informed that he was free to leave; whether the suspect was restrained; whether the suspect initiated contact; whether strong arm tactics were employed; whether the atmosphere was police-dominated; whether the suspect was arrested at the termination of questioning).

ment); *Revels*, 510 F.3d at 1270 (seven officers from two different agencies); *Sprosty*, 79 F.3d at 638, 642 (five officers, one of whom was visibly armed and in uniform, who surrounded the suspect in two police cars).

**[11]** Here, eight law enforcement officers, representing three different law enforcement agencies, entered Craighead's home. They were accompanied by two others, one of whom was Craighead's Air Force superior. All of the law enforcement personnel were armed, some wore protective gear, and some of them unholstered their firearms in Craighead's presence. The fact that the personnel represented three different law enforcement agencies was particularly relevant to Craighead's understanding of events. He testified that he was unclear as to whether the agencies were acting in coordination. The presence of the different agencies led him to doubt whether SA Andrews spoke for all of the agencies (or if she was required to) when she informed him that his statements were voluntary and that he was free to leave. A reasonable person in Craighead's position would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation.

2

**[12]** Second, we consider whether the suspect was at any point restrained, either by physical force or by threats. When law enforcement agents restrain the ability of the suspect to move—particularly through physical restraints, but also through threats or intimidation—a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation. *Orozco*, 394 U.S. at 325, 327 (finding custody where four officers entered the suspect's bedroom and acted as though he was "not free to leave," but did not actually handcuff or physically subdue the suspect); *Revels*, 510 F.3d at 1276-77 (finding that handcuffing of suspect upon entry into her home by law enforcement contributed to a custodial environment);

*Sprosty*, 79 F.3d at 642-43 (finding that police officers' use of their police cars to block the suspect's driveway to prevent his departure, and their standing so as to block the suspect's exit path from his home, contributed to a custodial environment); *Griffin*, 922 F.2d at 1350 (discussing restraint as a factor). Restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times. *See Mittel-Carey*, 493 F.3d at 40 (finding an interrogation custodial where the suspect was escorted by agents on the three occasions that he was permitted to leave the interrogation space, including while he used the bathroom); *Griffin*, 922 F.2d at 1350-51 ("We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest.")

[13] Craighead was not handcuffed or physically restrained. However, he was escorted to a back storage room and the door was closed behind him. Craighead testified that Detective Englander appeared to him to be leaning with his back to the door in such a way as to block Craighead's exit from the room. Detective Englander wore a flack jacket or "raid vest," and was visibly armed. Detective Englander did not participate in the interrogation by asking questions; he stood silent with his back to the door facing the suspect. Craighead testified that he did not feel he had the freedom to leave the storage room because, in order to get to the room's only door, he "would have either had to have moved the police detective or asked him to move." While perhaps not everyone in this circumstance would have felt restrained, it was certainly objectively reasonable for Craighead to believe he was under guard. When viewed in their totality, these facts demonstrate that Craighead's freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself. *See Miranda*, 384 U.S. at 467.

**[14]** At the evidentiary hearing on the *Miranda* issue, the government made much of the fact that Craighead was taller and larger in physical stature than both Detective Englander and SA Andrews. The government's argument appears to be that, because he was so much bigger, Craighead would not have felt intimidated or guarded by the two agents during the interview. This reasoning is untenable. When we consider whether a suspect would feel free to leave or terminate the interrogation, we do not presume that the suspect is considering accomplishing these goals by force. *Miranda*'s conception of "custody" does not depend on whether the suspect reasonably believes he can overpower his interrogators. On the contrary, we presume that citizens accord officers of the law respect no matter what their relative sizes. Indeed, Craighead testified that even though he was taller and heavier than Detective Englander, he found him to be "physically intimidating" because "[h]e represents law enforcement," and, we would add, he was armed. Far from accepting the government's invitation to discount these statements due to Craighead's size, we laud Craighead's instinct to afford respect and deference to an officer of the law.

**[15]** We understand that in many cases, when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve evidence and protect the safety of the agents. The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody. We agree with the First Circuit that:

> If the government is correct that the agents' actions were necessary for evidence preservation and officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the suspect]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs.

*Mittel-Carey*, 493 F.3d at 40.

3

**[16]** Third, we consider whether the suspect was isolated from others. The Supreme Court highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements. *Miranda*, 384 U.S. at 445-46, 449-50; *see also id.* at 448 (raising the concern that interrogations conducted in private are difficult to monitor for abusive techniques and have been associated with past practices of unlawful interrogation). "A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements . . . ." *Griffin*, 922 F.2d at 1352; *see also Revels*, 510 F.3d at 1275; *Sprosty*, 79 F.3d at 641. In this case, Sergeant Ramsey was specifically asked to accompany the law enforcement agents to Craighead's home to provide "emotional support" for Craighead. Yet, SA Andrews did not permit Sergeant Ramsey to accompany Craighead into the dark recess of the back storage room where the interrogation took place. The fact that Craighead did not even realize that Sergeant Ramsey was there to provide emotional support only underscores this point; he might have discovered Sergeant Ramsey was there to offer emotional support if SA Andrews had in fact permitted Sergeant Ramsey to accompany Craighead into the storage room and provide such support.

**[17]** SA Andrews testified that Sergeant Ramsey was not permitted to remain with Craighead because he was "non-law enforcement" and therefore would never be permitted to be present during an FBI interview. The record does not present evidence of any policy, formal or otherwise, to this effect. Moreover, the record does not indicate whether such a policy, if it exists, is directed to all interrogations or only interroga-

tions conducted after *Miranda* warnings are given. If such a policy does exist, the fact that the FBI may choose to exclude all "non-law enforcement" individuals from all of its interrogations does not make the interrogations less custodial in nature. On the contrary, the Supreme Court was explicit that the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation. *See Miranda*, 384 U.S. at 445-46, 448-50. Moreover, the fact that the FBI excluded non-law enforcement reinforces our understanding that the FBI controlled Craighead's environment; it is difficult to see how Craighead was free to leave if he was, apparently, not free to invite others into the storage room of his own house. The FBI may exclude whomever it chooses from an interrogation; *Miranda* requires that if the FBI isolates the suspect, and the suspect does not reasonably believe he is free to leave, warnings must be given.

4

**[18]** Fourth, we consider whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview. If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody. *Griffin*, 922 F.2d at 1349. SA Andrews told Craighead that he was not under arrest and that he would not be arrested that day regardless of what information he provided. She told Craighead his statements were voluntary. She also told Craighead that he was free to leave, although she could not recall whether she told him this once she had escorted him to the back storage room and closed the door, or whether she told him this when she first introduced herself to him in the living room. The fact that SA Andrews made these statements weighs against a finding of custody.

**[19]** The mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*. We must consider the delivery of these statements within the context of the scene as a whole. *See United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam) (holding that an interrogation was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any time because the suspect was questioned in a closed FBI car for over an hour while police investigators searched the house). The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether "a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (emphasis added).

**[20]** Although our past cases have not considered in-home interrogations, they are instructive on how to interpret an agent's statement that a suspect is free to leave in the context of where the statement was given. In *Crawford*, the suspect was questioned at an FBI office, which is of course far more like a police station than a home in terms of comfort and familiarity. The agent repeated more than once during the interview that the suspect was not under arrest and was free to leave. We found that the interrogation was not custodial: "Being aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial." *Crawford*, 372 F.3d at 1060. Particularly relevant was that the suspect "returned home at the end of the interview, without being arrested." *Id.* In *Lee*, however, the suspect was questioned in a closed FBI car parked in front of his own home by two agents for over an hour. 699 F.2d at 468. As the car was parked in front of Lee's home, it was possible he had his home in sight during the entire interview. Nevertheless, we held that "considering the totality of the circumstances a reasonable person could conclude that Lee reasonably might feel he was not free to decline the agent's request that he be interviewed." *Id.* Partic-

ularly relevant was the fact that "police investigators were in and around his house." *Id.* These cases read together suggest that an agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity.

**[21]** Here, several facts lead us to conclude that Craighead could have reasonably believed he was not free to leave, notwithstanding that SA Andrews told him he was. Most importantly, Craighead testified that the presence of agents from three different law enforcement agencies left him with doubt as to whether SA Andrews had the authority to pronounce him free to leave. He believed that even if the FBI permitted him to leave the storage room, he might be confronted by members of the other two agencies and forbidden to leave the house. Before he could leave the room, Craighead would have had to deal with Detective Englander, who appeared to be guarding the door to the storage room.

**[22]** Finally, we consider SA Andrews' statements that Craighead was free to leave in the context of the physical characteristics of the interview location. An interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere. Here, SA Andrews escorted the suspect to a storage room in back of the house. The room was unfurnished. SA Andrews testified that she herself was squatting on the floor, and that Craighead was probably sitting on a box or a chair grabbed from another room. The room had a single door. In front of the door stood an armed detective wearing a raid vest. Beyond the door were six more officers searching his house. Craighead testified that he did not want to leave his house entirely, because he did not want to leave the officers alone with his belongings and did not want to leave his dog unattended. Although SA Andrews had told him

he was "free to leave" and that his statements were voluntary, a reasonable person in Craighead's position would not have actually "felt" he was free to leave. *Thompson*, 516 U.S. at 112.

5

**[23]** Considering the totality of the circumstances as analyzed under the four factors listed above, we find that the fact that SA Andrews told Craighead that he was free to leave weighs in favor of finding he was not in custody, but the other three factors lead us to the conclusion that Craighead was in custody for purposes of *Miranda*. Craighead's home had become a police-dominated atmosphere. Escorted to a storage room in his own home, sitting on a box, and observing an armed guard by the door, Craighead reasonably believed that there was simply nowhere for him to go.

IV

The search of Craighead's home was lawful. Craighead did not allege any specific portion of the warrant affidavit that was actually false or misleading. We affirm the district court's ruling that Craighead was not entitled to a *Franks* hearing.

**[24]** The interrogation within Craighead's home was custodial, and *Miranda* warnings were required. Because the warnings were not given, Craighead's self-incriminating statements should have been suppressed. We therefore reverse this portion of the district court's order and remand for further proceedings.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.