2017 DEC 11 AM 10: 52

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

EZEKIEL JAMES WATKINS,

Appellant.

No. 73352-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: December 11, 2017

APPELWICK, J. — Watkins was convicted of first degree murder. He argues that police elicited a confession in violation of Miranda,[1] that evidence was obtained in violation of the privacy act,[2] that a search warrant was overbroad, and that the trial court improperly dismissed a juror. We affirm.

## FACTS

High school student Kathy Chou disappeared. Police contacted her ex-boyfriend, Ezekiel Watkins. He spoke with police at the police station. Watkins also took a polygraph test. He was not arrested at that time.

Over one year later, Watkins' friend Giovanni Candelario told police that he had seen Watkins covered in blood and dirt on the night Chou disappeared. Candelario also told police that he told Watkins that he suspected he was involved in Chou's disappearance, and Watkins did not deny it. Another friend, Jon Carpenter, told police that he had given Watkins a shovel the night that Chou

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] Ch. 9.73 RCW.

disappeared. In light of these revelations, Detective Greg Barfield called and asked Watkins to come to the station for an interview. They agreed to meet at the station six days later, on July 6, 2011, at 11:00 a.m.

Watkins drove himself to the station. The interview room was located within a secure area of the building. The area could be opened from the inside without a key. Watkins sat closest to the door. The police did not take his phone or keys. He was not handcuffed.

When he began the interview at 11:24 a.m., one of Detective Barfield's first statements to Watkins was as follows:

> So before we get started I want to make sure you understand that we're just talking to everybody in the case. It's new to me cause I wasn't involved in it back when she, when Kathy went missing. I want you to know that you are free to go at any time. It's a voluntary statement. Matter of fact if you do decide to do that, if you want to leave this door right here, you go out that door and hang a right and that's the door you came in at.

At 11:55 a.m., Detective Barfield notes that, contrary to Watkins' prior statements, phone records show that they texted and called one another 46 times that day. Barfield tells Watkins that "we need to know everything," and "I'm asking you to be straight with me."

At 12:04 p.m., Watkins eventually concedes that he saw Chou that night, they took a walk in the park, and finished between 9 and 10. At 12:16 p.m., police placed a shovel wrapped in evidence tape in the interview room in the view of Watkins. At 12:17 p.m., Detective Barfield tells Watkins, "I've given you many opportunities to tell me before I had to confront you if there's something that's different."

Shortly thereafter, Watkins tells Detective Barfield that Chou cut her own throat. Watkins admits that his friend Carpenter brought a shovel and helped him bury her body. Detective Barfield pressed further,

> But Ezekiel, I have a hard time believing that she somehow gets a hold of your knife and then stabs herself multiple times in the neck and your reaction is to not go to call the police or call for an ambulance but to call your friend, have him meet you and you guys go and bury the body. It doesn't sit right with me. Right? And I just want you to be truthful with me about it. Cause yeah I can tell, it's pretty easy honestly to tell you when you're being truthful and when you're not being truthful. That's how I know to ask what questions I ask because you kind of, for most people honestly it is very hard for them to hide a lie on their face and with their body. You just do things you know subconsciously. You don't realize you're doing it. But for me it's like, it's like a red flag going up when I see it. So I'm just asking you to be straight. I'm going to give you an opportunity to tell me how.

At 12:37 p.m., Watkins admits to stabbing Chou, although he claims it occurred during a physical struggle between the two.

Immediately thereafter, Detective Barfield reads Watkins his <u>Miranda</u> rights. Watkins waived those rights, the interview continued, and Watkins took police to the burial site later that day. Watkins was charged with first degree murder. His statements that day were admitted into evidence after a CrR 3.5 hearing. A jury found him guilty. He appeals.

## DISCUSSION

Watkins makes four arguments. First, he argues that the State obtained incriminating statements in violation of <u>Miranda</u>, and the trial court erred in admitting those statements. Second, he argues that the trial court erred in admitting evidence that was obtained in violation of the Washington privacy act.

Third, he argues that the trial court admitted evidence that was obtained pursuant to an overbroad search warrant. Finally, he argues that the trial court erred in dismissing a juror due to a family emergency.[3]

## I. Miranda

Watkins first argues that the police violated his Fifth Amendment rights under Miranda. When Watkins confessed to stabbing Chou, he had not been given Miranda warnings. Watkins argues that the circumstances of the interview amounted to a custodial interrogation and Miranda warnings were required. He notes that the interview occurred in a small room at the police station. He notes that the officer told Watkins that he needed to be truthful. Further, he claims that police strategically brought into the interview room a piece of evidence—a shovel—that suggested that police knew Watkins was not being truthful.

### A. Custodial Interrogation

When a state agent subjects a suspect to custodial interrogation, the Fifth Amendment to the United States Constitution requires that Miranda warnings must be given. 384 U.S. at 467-68. If police conduct a custodial interrogation without Miranda warnings, statements made by the suspect during the interrogation must be suppressed. Id. at 479. Whether a person is in "custody" is an objective inquiry: considering all the circumstances, would a reasonable person feel that his or her freedom was curtailed to a degree associated with formal arrest? State v.

---

[3] On cross appeal, the State assigns error to the trial court's decision to exclude evidence regarding an alleged "trophy" that Watkins collected from the victim on grounds that it was overly prejudicial. But, because we affirm, we do not address this argument.

Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). The defendant must show some objective facts indicating his or her freedom of movement was restricted or curtailed. State v. Lorenz, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004). We review a trial court's custodial determination de novo. Id. at 36.

Watkins argues that he was subject to a custodial interrogation from the outset of the interview.[4] He cites to United States v. Jacobs, 431 F.3d 99, 105 (3d Cir. 2005), where the court reasoned that all station house interrogations should be scrutinized with extreme care. Further, he argues that Detective Barfield's conduct over the course of the interview created a custodial setting by conveying his belief that Watkins was guilty, pressing for the truth, and placing the incriminating shovel into Watkins' view.

The station house interview here is comparable to the facts in Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). A burglary victim told police that Mathiason was the only possible culprit she could think of. Id. at 493. About 25 days after the burglary, the officer told Mathiason he would like to discuss something. Id. Mathiason voluntarily went to the police station. Id. He

---

[4] Watkins first stresses that the trial court erred in applying a subjective standard to whether Watkins was subject to custodial interrogation. He notes that, in support of its decision, the trial court cited Watkins' belief that he would be able to go to work later that afternoon after he had just admitted to stabbing and burying Chou. Watkins is correct that the proper standard is an objective one. See Lorenz, 152 Wn.2d at 36-37. But, the trial court's ultimate conclusion was that "[u]nder the totality of the circumstances, a reasonable person in the defendant's position would not have felt that his freedom was curtailed." (Emphasis added.) This reflects an objective analysis. And, similar to this situation, many prior cases contain passing references to a suspect's own belief. See, e.g., State v. D.R., 84 Wn. App. 832, 834, 836, 930 P.2d 350 (1997) (explaining that the proper standard is a reasonable person standard, but also noting that the suspect testified that he did not believe he was free to leave).

5

was taken into a room with a closed door, and told that he was not under arrest. Id. The officer told Mathiason that he wanted to discuss the burglary, and that his truthfulness would possibly be considered by the district attorney or the judge. Id. The officer falsely claimed that he had discovered Mathiason's fingerprints at the scene. Id. Mathiason confessed after about five minutes. Id.

The United States Supreme Court found that there was no Miranda violation. Id. at 495. It concluded that this "noncustodial situation is not converted to one in which Miranda [sic] applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on movement, the questioning took place in a 'coercive environment.'" Id. Like Mathiason, Watkins went voluntarily to the station, was told he could leave, and the police had suspicion that Watkins was involved.

But, Watkins argues that this case is more similar to Jacobs. In that case, Jacobs was a police informant. Id. at 102. Police subsequently learned that Jacobs was engaging in illegal activity that violated police instructions. Id. at 103. Jacobs arrived at the station upon police request. Id. at 103. In an open office area, police placed suitcases that they thought would elicit information from Jacobs. Id. With the suitcases in view, the police told her that they had information that she was assisting in the trafficking. Id. Shortly thereafter, she confessed to illegal activity. Id. at 103-04

The <u>Jacobs</u> court found that this was a custodial interrogation. <u>Id.</u> at 108. It reasoned,

> To recap, in Jacobs' case, in addition to (1) the questioning taking place at the FBI offices, and (2) Sullivan believing Jacobs was guilty, the following additional factors were present: (3) Jacobs was summoned to FBI offices without explanation; (4) Sullivan's questions were confrontational and intimidating; (5) he used interrogation tactics, including placing the incriminating suitcases in Jacobs' view; (6) he communicated to Jacobs that he thought she was guilty; (7) Jacobs felt obligated to come to and stay at the questioning because she was reasonably under the impression that she was still an FBI informant; (8) she was not specifically told she was not under arrest before questioning began; and (9) she did not agree to meet with Sullivan with knowledge of the fact that questioning about a criminal offense would take place.

<u>Id.</u> Although the suitcase placement in <u>Jacobs</u> is somewhat comparable to the strategic shovel placement here, <u>Jacobs</u> is critically different. There, the court noted that Jacobs would have felt compelled to speak with police given her status as an informant. <u>Id.</u> Watkins was under no such obligation. He had denied police requests before.[5] And, unlike <u>Jacobs</u>, police unequivocally told Watkins that he was "free to leave at any time." <u>Id.</u> at 107.

Watkins also relies on <u>United States v. Craighead</u>, 539 F.3d 1073 (9th Cir. 2008). There, armed officers wearing flak jackets, some with unholstered weapons, executed a search warrant on Craighead's residence. <u>Id.</u> at 1078. During the search, an agent told Craighead they wanted to speak with him. <u>Id.</u> And, Craighead was told he was free to leave. <u>Id.</u> at 1078. The agent directed him to a storage shed in the back of his house, and interviewed him for 20 to 30

---

[5] For example, he once denied a police request for him to take a polygraph test. A few days later, Watkins changed his mind and took the test after initially refusing.

minutes. Id. at 1078. A detective was guarding the door. Id. at 1088. Agents from three different law enforcement agencies were present for the search. Id. The court found that the interview was a custodial interrogation. Id. at 1089.

The distinctions between Craighead and Mathiason are significant. Craighead did not voluntarily go to a police station. The police came to his home. See id. at 1078. Although he was informed he could leave, this instruction was less valuable given that he was already on his own property, and could not retreat to the safety of his own home, which was being searched by officers. Id. at 1088. And, the court found that the presence of multiple agencies suggested that others besides the interviewing agent might forbid him to leave. Id.

Lorenz, is also instructive. As Lorenz's residence was being searched as part of a child molestation investigation, police pulled her aside and questioned her. Lorenz, 152 Wn.2d at 27. The police told Lorenz she was not under arrest and was free to leave at any time, and she signed a statement to that effect. Id. at 37-38. But, she was not allowed to enter her trailer during the search. Id. at 37. The officers then told her to " 'sit here'. " Id. at 27. She confessed in a written statement. Id. at 27-28. Lorenz argued that she was effectively in custody for the purposes of Miranda. Id. at 36. The court reasoned that "[i]t is irrelevant whether Lorenz was in a coercive environment at the time of the interview." Id. at 37. Relying on the explicit instructions that Lorenz was free to leave, the court found that Lorenz was not in custody.[6] Id. at 37-38.

---

[6] Lorenz contradicts another argument made by Watkins. During the critical interview, Watkins initially confessed to Detective Barfield that he buried Chou's remains after she had stabbed herself. Only later did Watkins finally confess to

Here, the police requested an interview. And, similar to Mathiason and unlike Craighead, Watkins voluntarily showed up at the police station at a mutually agreed time. The police told him that he was "free to leave." They told him how to exit the station. Like Mathiason, the fact that the interview occurred in the police station setting did not render the interview custodial. The presence of the shovel wrapped with evidence tape was less deceptive than the false statement that the police had found Mathiason's fingerprints at the scene. This tactic did not make the interrogation custodial. In light of these cases and Miranda's objective standard, the trial court did not err in concluding that Watkins was not subjected to custodial interrogation prior to confessing.

B. Admissibility of post-*Miranda* statements

Watkins' first confession occurred prior to him receiving Miranda warnings. After the police read him his Miranda warnings, he confessed again. Watkins argues that this is an interrogation strategy that the Supreme Court declared unconstitutional in Missouri v. Siebert, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

In Siebert, the police arrested and ultimately obtained a confession from Siebert. Id. at 604-05. In their interrogation, the police deliberately refrained from

_____

stabbing Chou. Watkins argues that because this amounted to a confession of a separate crime—unlawful disposal of human remains under RCW 68.50.130— it supports the inference that he was in custody. But, in Lorenz the court rejected a similar argument: "it is, as the State contends, irrelevant whether the police had probable cause to arrest Lorenz (before or during the interview)." 152 Wn.2d at 37. Therefore, the fact that police had probable cause during the interview to believe that Watkins had committed a different crime than that being investigated does not establish that he was in custody.

providing Miranda warnings as part of a "question first" strategy. See id. at 605-06. Writing for the four justices in the plurality, Justice Souter reasoned that the key inquiry underlying Miranda is whether the warnings reasonably convey to a suspect his or her rights under Miranda:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on the suspect's part would be perplexity about the reason for discussing rights at that point . . . . Thus, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

Id. at 613-14 (alteration in original) (footnote omitted) (quoting Moran v. Burbine, 475 U.S. 412, 424, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

Justice Kennedy concurred in the judgment, and provided the fifth and decisive vote to exclude Siebert's confession. Id. at 618 (Kennedy, J., concurring). He reasoned that "[t]he plurality is correct to conclude that statements obtained through the use of this technique are inadmissible." Id. He agreed that "only in the infrequent case," such as Siebert, when police use a question-first strategy in a calculated way, post-Miranda statements must be excluded. Id. at 622. Adopting Justice Kennedy's analysis, this court has reasoned that a trial court must suppress postwarning confessions during a deliberate two-step interrogation where a midstream Miranda warning did not effectively apprise the suspect of his or her rights. State v. Hickman, 157 Wn. App. 767, 774-75, 238 P.3d 1240 (2010).

10

Siebert was arrested prior to the first phase of questioning. 524 U.S. at 604. But, Watkins was not under arrest and not subject to custodial interrogation when he first confessed. Admission of his confession was therefore not barred by Seibert, as framed in Justice Kennedy's concurrence, and was surely not the "infrequent case" that it contemplates.

## C. Waiver of *Miranda* Rights

Watkins has fetal alcohol spectrum disorder that causes cognitive impairment. Watkins argues that his cognitive disabilities, in conjunction with the circumstances, rendered his waiver of his Miranda rights involuntary. After hearing his rights, when asked whether he is willing to continue speaking with Detective Barfield, Watkins stated, "I guess so." Detective Barfield said, "You guess so?" and "Is that a yes?" Watkins responds, "Yeah."

Under Miranda, a confession is voluntary, and therefore admissible, if made after the defendant has been advised of his or her rights, and the defendant then knowingly, voluntarily, and intelligently waives those rights. State v. Aten, 130 Wn.2d 640, 663, 927 P.2d 210 (1996). The voluntariness of a confession is determined from a totality of the circumstances under which it was made. Id. at 663-64. Factors considered include a defendant's physical condition, age, mental abilities, physical experience, and police conduct. Id. at 664. A defendant's mental disability is relevant, but does not necessarily render a confession involuntary. Id. When a trial court determines a confession is voluntary, an appellate court will not disturb that finding if it is supported by substantial evidence from which the trial

11

court could have found that the confession was voluntary by a preponderance of evidence. Id.

The State and Watkins each presented expert testimony on whether Watkins' waiver of his Miranda rights was knowing and voluntary in light of his cognitive impairment. The State offered testimony from Dr. Kenneth Muscatel. Dr. Muscatel opined that, while Watkins has cognitive impairment, he was capable of understanding his Miranda rights and able to knowingly, intelligently, and voluntarily waive them. The trial court concluded that Dr. Muscatel's testimony was "more persuasive" than Watkins' expert.

In arguing that the trial court erred, Watkins cites numerous facts from the record showing Watkins' impairment, such as his low cognitive difficulties. But, Dr. Muscatel noted that he was tracking the conversation throughout the interrogation, which suggested that his waiver was voluntary. Based on his evaluation, Dr. Muscatel testified that he "had no question about him being competent to understand, appreciate, and waive Miranda, if he so chose." Substantial evidence supports the trial court's conclusion that Watkins' waiver of his Miranda rights was knowing, intelligent, and voluntary.

II.   Privacy Act

During the interviews of Watkins, police used a handheld audio recorder that Watkins was aware of, but also recorded Watkins via video for a period after the handheld audio recorder was turned off.[7] Watkins argues that the trial court

---

[7] The State agreed not to offer these recordings that were made without Watkins' knowledge.

should have excluded observations and summaries of the conversations, and evidence obtained in the investigation that stemmed from the conversations, because the conversations were recorded in violation of the privacy act.[8]

If a party violates RCW 9.73.030, which prohibits unconsented recording of "private conversations," the proper remedy is exclusion, as well as all evidence obtained during the conversation. See State v. Fjermestad, 114 Wn.2d 828, 836, 791 P.2d 897 (1990). By contrast, if a party violates RCW 9.73.090(1)(b), which requires officers to inform persons being recorded that they are in fact being recorded, the remedy is exclusion of the recording only. Lewis v. Dep't of Licensing, 157 Wn.2d 446, 472, 139 P.3d 1078 (2006). Whether a conversation was private under the privacy act is a question of law reviewed de novo. State v. Kipp, 179 Wn.2d 718, 728-29, 317 P.3d 1029 (2014).

In Lewis, our Supreme Court noted that "this court and the Court of Appeals have repeatedly held that conversations with police officers are not private." 157 Wn.2d at 460. There "is no reasonable expectation of privacy for persons in custody undergoing custodial interrogations." Id at 467. Watkins' challenge was solely to the application of the trial court order to portions of the conversation after he confessed, was arrested and was read his rights. Therefore, he was subject to custodial interrogation during the entirety of the recorded conversations.[9] Watkins'

---

[8] The State argues that this argument is waived. But, in his motion to exclude, Watkins argued that "violation of the act requires not only suppression of the recordings themselves but of all evidence derived directly and indirectly as a result of that violation." This is sufficient to preserve this issue.

[9] Watkins confessed to stabbing Chou at roughly 12:37 p.m. Police read him his Miranda rights immediately thereafter.

conversations with police here were not "private." Recording those conversations did not violate the privacy act. The trial court did not err in denying Watkins' request to exclude the evidence.

III.   Search Warrant

Police obtained a search warrant for Watkins' parents' home where he had previously resided. The warrant specified items to be seized, such as specific clothing items, a knife with a camouflage handle, a pick axe, and "[a]ny other item . . . that Detectives reasonably believe may be associated with this crime." The warrant was granted in response to an affidavit that stated that Watkins killed Chou because Chou had been harassing Watkins' new girlfriend. Watkins argues that the "any other item" language is overbroad, and therefore violated the requirement that items to be seized be described with particularity.

The Fourth Amendment requires that search warrants particularly describe the place to be searched and the persons or things to be seized. U.S. CONST. amend. IV. Warrants must enable the searcher to reasonably ascertain and identify the things that are authorized to be seized. State v. Besola, 184 Wn.2d 605, 610, 359 P.3d 799 (2015). This court reviews de novo the issue of whether a warrant meets the particularity requirement of the Fourth Amendment. State v. Clark, 143 Wn.2d 731, 753, 24 P.3d 1006 (2001). And, it evaluates search warrants in a common sense, practical manner, rather than using a hypertechnical standard. State v. Stenson, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997).

Quoting Marron v. United States, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927), Watkins contends that the purpose of the particularity requirement is that " 'nothing is left to the discretion of the officer executing the warrant.' "[10] But, decisions of this court have reasoned that a "grudging and overly technical requirement of elaborate specificity has no place in determining whether a warrant satisfies the Fourth Amendment requirement of particularity." State v. Christiansen, 40 Wn. App. 249, 254, 698 P.2d 1059 (1985).

In Christiansen, a clause in the warrant directed seizure of " 'all evidence and fruits of the crime(s) of manufacturing, delivering, or possessing controlled substances.' " Id. at 251. The court found that this was sufficiently particular, because the description of the items to be seized was confined to the evidence of the suspected crime. Id. at 254. This court came to a similar conclusion in State v. Reid, 38 Wn. App. 203, 212, 687 P.2d 861 (1984):

> The warrant here sufficiently limited the searching officers' discretion. The phrase "any other evidence of the homicide" specifically limited the warrant to the crime under investigation. The specific items listed, such as a shotgun and shotgun shells, also provided guidelines for the officers conducting the search. Therefore, these limitations were adequate to prevent a general exploratory search.

Similarly here, the warrant limited the scope to items "[d]etectives reasonably believe may be associated with this crime." (Emphasis added.)

---

[10] Our Supreme Court has reasoned that this specific statement, from Marron v. United States, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927), "is not read literally, because to do so would mean that an officer could never seize anything which is not specifically named in the warrant." State v. Perrone, 119 Wn.2d 538, 546, 834 P.2d 611 (1992).

15

Contrast these holdings with a case cited by Watkins, State v. Garcia, 140 Wn. App. 609, 622, 166 P.3d 848 (2007). There, the court invalidated a warrant that authorized a search of " 'any and all persons present' " at a motel room that was to be searched in relation to a drug investigation. Id. at 616, 623. It reasoned that this language was not limiting and that a generalized belief that all persons present are involved in criminal activity is an insufficient nexus. Id. at 623. Garcia does not support a conclusion that the warrant was overly broad.

Watkins argues that police were improperly rummaging through his belongings, as evidenced by the personal writings that they seized. But, here the warrant explicitly directed officers to limit their search to items related to the crime. As illustrated in the affidavit, the detectives knew the crime being investigated, the murder of Chou, was directly related to Watkins' romantic relationship with his new girlfriend. A journal and notes that contain the new girlfriend's name is precisely where a detective might reasonably expect to find personal notes relevant to the crime and motive. As in Reid, the warrant was sufficient to protect against a general exploratory search. It was sufficiently particular.

IV.     Dismissal of Juror

Watkins next argues that the trial court erred in dismissing a sitting juror due to a conflict, instead of delaying trial to accommodate the juror. The trial court replaced juror 13 with an alternate juror after juror 13 was informed that his mother had a medical emergency.

A defendant in a criminal case has a right to be tried by an impartial, 12-person jury. State v. Gentry, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995). A

16

defendant has no right to be tried by a particular juror or by a particular jury.[11] Id. In cases, like the one here, that are expected to take a considerable time, the trial judge may direct the selection of one or more alternate jurors. Id. CrR 6.5 governs the use of alternate jurors. State v. Stanley, 120 Wn. App. 312, 315, 85 P.3d 395 (2004). This court reviews a trial court's decision to replace a juror with an alternate for abuse of discretion. State v. Ashcraft, 71 Wn. App. 444, 461, 859 P.2d 60 (1993).

Juror 13 requested to be excused for a family medical emergency. The defense and the trial court questioned the juror about the specifics of the situation. Juror 13 had power of attorney with respect to his mother who was experiencing a medical emergency. After this questioning, the trial court concluded that replacement of the juror was warranted. In Ashcraft, the court upheld the trial court's replacement of a juror who had a planned flight to Belgium, and the jury deliberations had been prolonged due to adverse weather. Id. at 461-62. Surely the need to attend to this emergency was more pressing than the planned flight in Ashcraft. The trial court did not abuse its discretion in determining that the medical emergency of the juror's mother provided a proper basis for being excused.

Watkins proposed a brief delay in the proceedings to accommodate the juror, rather than dismissing him. Whether the absence of the juror would have been very brief could not be known with certainty. The trial court properly weighed

---

[11] Relatedly, Watkins suggests that the replacement of the juror with the alternate juror implicates his constitutional rights. But, Watkins cannot establish that seating alternate jurors amounted to a constitutional error, because he "has no right to be tried by a jury that includes a particular juror." State v. Jorden, 103 Wn. App. 221, 229, 11 P.3d 866 (2000).

No. 73352-4-I/18

the impact of a further delay on the trial. It was not an abuse of discretion to dismiss Juror 13 rather than grant a continuance.

We affirm.

_Appelwick, J._

WE CONCUR:

_Mann, J._          _Becker, J._

18