Filed 7/8/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MATTHEW W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW W.,<br><br>    Defendant and Appellant. | A159931<br><br>(Napa County<br>Super. Ct. No. 202036189-01) |

Defendant Matthew W. appeals from the juvenile court's jurisdictional findings and dispositional order, in which the court sustained an allegation of assault with a deadly weapon and placed defendant on probation with various terms and conditions. On appeal, defendant contends the jurisdictional findings must be reversed because the juvenile court (1) improperly admitted defendant's pre-arrest statements to police made during a custodial interrogation, in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and (2) failed to fully consider all of the evidence admitted at the jurisdictional hearing, which led it to misapply the standard of proof beyond a reasonable doubt. He also contends the court improperly imposed an electronic search condition of probation, which must be stricken.

1

We conclude that defendant's pre-arrest statements to police were made during a custodial interrogation without the required *Miranda* advisements, and that the erroneous admission of evidence of those statements at the jurisdictional hearing prejudiced defendant. We shall therefore reverse the court's jurisdictional findings and dispositional order.

## PROCEDURAL BACKGROUND

On January 22, 2020, the Napa County District Attorney filed a juvenile wardship petition pursuant to Welfare and Institutions Code section 602, subdivision (a), alleging that defendant had committed assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)—count one),[1] and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)—count two). The petition further alleged, as to count one, that defendant had personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)), and, as to count two, that he had caused the victim to suffer great bodily injury resulting in paralysis (§ 12022.7, subd. (b)) and had personally used a deadly weapon, a knife (§ 12202, subd. (b)(1)).

On February 19, 2020, following a contested jurisdictional hearing, the juvenile court found true all of the allegations in the petition except for the paralysis enhancement. The court subsequently dismissed count two and the accompanying enhancement, at the request of the prosecutor.

On March 4, 2020, at the dispositional hearing, the court declared defendant a ward of the court and placed him on probation with various terms and conditions, including an electronic search condition.

On March 17, 2020, defendant filed a notice of appeal.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

# FACTUAL BACKGROUND

*Prosecution Case*

Ralph C.,[2] the stabbing victim, testified that on January 21, 2020, approximately 12:30 or 1:00 a.m., he was pushing his bike northbound on Main Street in Napa. He was on the way to a Seven-Eleven store after having dinner with a friend who lived nearby when a young man— subsequently identified as defendant's friend, Andrew G.—ran out from behind a fence next to a car and almost ran into him. Ralph, who thought Andrew might be breaking into the car, asked, " 'What are you doin?' " Andrew, who appeared stressed, said, " 'I live here,' " before running across the street. Ralph thought he "was being bullshitted" and that he had caught Andrew breaking into the car and then running away. Ralph therefore chased him down the street from about 100 yards behind, with his flashlight on.

Ralph then noticed a Mustang automobile flashing its lights at the end of the block, and he got onto his bike to continue chasing Andrew. As he followed him past the car, Ralph looked inside the car with his flashlight and saw the outline of a person in the driver's seat. Ralph then caught up with Andrew. He got off his bike and, holding his bike in one hand and his flashlight in the other, asked Andrew why he was running and what was going on, but did not recall receiving any response. The two of them were less than five feet apart, with Ralph's bike between them. He never pushed or threatened Andrew.

Ralph then heard someone scream from behind him, " 'Leave my friend alone.' " Ralph dropped his bike, turned around, and saw someone in a

---

[2] All witnesses will be referred to by their first name, to protect their privacy.

3

hooded sweater.  That person—later identified as defendant—threw a punch at Ralph before running to his Mustang.  The punch felt like "a little nudge on the side."  Ralph then realized that he had been stabbed and that his jacket was filling up with blood, which was starting to drip.  He caught a glimpse of the knife defendant was carrying; it looked like a "fillet knife," curved and about nine inches long with a wooden handle.  He screamed, " 'He fuckin' stabbed me.' "

Ralph testified that he is an alcoholic and drinks a fifth of vodka every day.  He had been drinking several hours before the incident, and had imbibed a few glasses of wine and a couple of shots of Jack Daniels.  But he was not drunk at the time of the incident.  He also smoked one "hit" of marijuana that night and had taken methamphetamine the Sunday before, but was not under the influence during his interaction with defendant and Andrew.  At the time of the hearing, he was 57 years old; 5 feet 10 or 11 inches tall; and weighed 230 pounds.  He was homeless and living in a storage shed, while also staying with other people at times.

The stab wound was to Ralph's left bicep.  He subsequently underwent surgery for the stab wound and was still in a cast at the time of the hearing.  He still had numbness in his thumb and only limited movement in his fingers due to nerve damage.

On cross-examination, Ralph denied pushing Andrew on the chest with both hands.  He also denied telling defendant that he was going to kill him.  After the stabbing, he was cut and scared and acknowledged calling out to a friend in a white car.  He was hoping his friend was nearby and said to follow the car of defendant, who was leaving the scene.  Neither Ralph nor his friend chased the car, but his friend did come up to Ralph as he pushed his bike along the sidewalk and took him to the hospital.

Andrew G., who had turned 18 the week before the jurisdictional hearing, testified that he and defendant are friends. On January 21, 2020, approximately 12:45 or 1:00 a.m., he was sneaking out of his house in Napa to go hang out with defendant, who was sitting in his car on the corner. As he snuck out, a man on a bike—later identified as Ralph C.—stopped him and said, " 'What's up?' " Andrew, who was startled, said, " 'This is my house and I'm just leaving.' " He then walked away. As he walked toward the passenger side door of defendant's car, he looked back and realized Ralph was about 50 feet away and following him, which concerned him. He opened the passenger side door to defendant's car, said that a man was following him, and told defendant to get out of the car. Andrew and defendant had been planning to hang out at Andrew's house, but because he had told Ralph that he lived there and did not want any trouble, he planned to walk around the block and wait for Ralph to go away, instead of going directly back to his house.

Defendant got out of the car, but was a few paces behind Andrew, who started walking away. After Andrew turned the corner, Ralph rode up to him on his bike and initially stopped three or four feet away. Ralph then got confrontational. Andrew did not recall exactly what Ralph said, but he was "definitely aggressive" and thought Andrew had stolen something. Andrew then said, "get the F out of here" and put his hands up in self-defense. Ralph dropped his bike, approached Andrew, and pushed him on the chest with both hands. Andrew did not fall down, but the push was hard enough that he stepped back three or four steps.

Andrew testified that defendant, who had been following behind Andrew, stepped up to Ralph and said, " 'Hey, don't touch my friend.' "

5

Ralph, who was bigger than both Andrew and defendant[3] and "was looking very threatening," turned around to face defendant, still acting aggressively. About 5 to 10 seconds later, defendant appeared to throw a punch at Ralph's left shoulder area; Andrew did not see a knife. Ralph looked down and said to defendant, " 'Hey, did you stab me?' " Andrew then ran down the street and hid behind a car for 5 to 10 minutes, waiting to see if Ralph would pursue him. He heard Ralph yell to his friend, " 'Hey, go get him,' " and saw the friend start pursuing defendant in a white SUV-type vehicle. Andrew called defendant on his cell phone, and defendant said the person in the car was still chasing him. Defendant called Andrew back a few minutes later and said he was going to come and pick Andrew up, which he did.

After Andrew got into defendant's car, defendant told him he had stabbed Ralph, the man who had been chasing Andrew, and said something like, " 'Nobody messes with my friend.' " Defendant showed him a large knife with a wooden handle, which had blood on it. Defendant then drove to his own house, where they talked more about the stabbing. Defendant showed him the knife again before going to clean it. Andrew's father called Andrew after noticing he was gone, and Andrew told defendant he had to go home. Defendant asked Andrew not to mention him because he did not want to be involved. While still at defendant's house, Andrew deleted the text messages on his phone between him and defendant from that night, which were about when and where to meet. He had trouble getting a ride with Uber, so he eventually took a taxi home.[4]

---

[3] Andrew testified that he was 5 feet 7 inches tall and weighed 185 pounds, and that defendant was "a little bit smaller" than him.

[4] Stephen G., Andrew's father, testified that he realized Andrew was not at home early in the morning of January 21, 2020, after he saw a disturbance outside and spoke with officers who were on the scene. He called

On cross-examination, Andrew testified that after Ralph first spoke to him and he started walking away, Ralph seemed to be grunting and making random sounds, which made Andrew feel uneasy. He acknowledged later telling police he thought Ralph was "a crackhead." When Ralph started shining a flashlight and following him, Andrew felt threatened. He became more frightened when Ralph later rode up quickly on his bike and started yelling and questioning him again about what he was doing.

Andrew acknowledged later telling a police detective that he believed the incident resulted in a stabbing "because the guy was getting aggressive with [Andrew] and getting in [his] face, and [defendant] didn't step in until the guy became physical with [Andrew]," which was the truth. He also testified that he had heard Ralph threaten defendant during the confrontation, but he did not remember what he said. Andrew did not, however, hear defendant say that he had not realized he had stabbed Ralph until seeing the blood on his knife.

On redirect examination, Andrew acknowledged that he initially lied to police about the incident, and it took a long time for him to acknowledge the stabbing and defendant's involvement because he did not want defendant to get in trouble.

Napa Police Detective Brendt Keown testified that about 6:00 a.m. on January 21, 2020, he spoke with defendant in his home about the incident with Ralph. During the questioning, defendant gave a statement about the stabbing. Defendant told him that after Andrew snuck out of his house, he walked by defendant's car and said to "be cool" and that there was a " 'tweaker' " following him. Defendant then followed Andrew down the street

---

Andrew and told him to come home. Andrew returned home about an hour later.

7

to the location where Ralph confronted them and pushed Andrew. Defendant told Keown that he then pushed Ralph. Keown asked what he meant by " 'pushed,' " and defendant clarified that he had stabbed Ralph. Defendant said he had thought that Andrew was going to be "strangled or hurt in some way." Defendant never said he saw Ralph with a weapon.

Defendant, who had described the knife he had used as black and red, initially told Keown that he had thrown it away, "and then we worked to the point where he brought it home and he cleaned it and it was in his bedroom." Keown then took 10 knives from under defendant's dresser, two of which were switchblades. Defendant told him he collected knives. One of the knives Keown found matched Ralph's and Andrew's descriptions; a different knife matched defendant's description.

Defendant said that after the stabbing, he and Andrew drove to his (defendant's) house. He said he did not subsequently drive Andrew home because he wanted to conserve gas.

On cross-examination, Keown acknowledged that defendant had told him that he saw Ralph following Andrew, shining his light, questioning Andrew, and getting aggressive. Keown also acknowledged that defendant told him Ralph had said, " ' "Y'all are gonna fuckin' die," and it all happened really fast and I wanted to try to protect my friend.' " Although defendant initially said, " 'I pushed the guy with the knife,' " he eventually admitted that what he meant was that he had stabbed Ralph in the shoulder. But he also said, " 'I did it in a way where I pushed him off my friend at the same time.' " He said Ralph was " 'getting on' " and touching Andrew, and he did not want Ralph to hurt his friend. He said he " 'was scared' " and the "only reaction [he] knew was to protect' " Andrew.

8

On redirect examination, Keown testified that defendant had said he heard Ralph say they were " 'gonna fuckin' die' " after defendant had stabbed him and was going back to his car.  Defendant never said Ralph took an aggressive stance toward him or that Ralph had a weapon.

***Defense Case***

Defendant testified that he was 17 years old.  He was 5 feet 6 inches tall and weighed 130 pounds.  He had never previously been in trouble with the police or interrogated by a police officer.  Around midnight on January 21, 2020, he and his friend Andrew were texting each other because they were planning to hang out at Andrew's house.  Defendant then drove his Mustang automobile to Andrew's street and parked across from Andrew's house.  He stayed in his car, waiting for Andrew to come out.  He then saw Andrew walking at a fast pace.  Andrew came up to his car, opened the passenger side door, and said, "dude, there is this weird guy following me.  Let's go around the block real quick and lose him . . . ."

Andrew closed the car door and continued walking down the sidewalk. Defendant reached into his backpack, which was on the backseat of the car, and took out a knife that was inside it.  The knife was in the backpack because he had taken it with him the day before to show it to another friend. Defendant hooked the knife onto his pants, got out of the car, and started walking along the sidewalk in the same direction Andrew had gone. Defendant noticed there was a person behind him on a bicycle, riding pretty quickly, who was mumbling or talking to himself and had a flashlight turned on.  The person—Ralph C.—was riding straight towards defendant, who had to jump out of the way.  Defendant realized that Ralph was following Andrew, which freaked him out.  Ralph rode up to Andrew and got off his bike.  Andrew stopped walking and was facing Ralph.  He heard Ralph ask

9

Andrew, "Hey what are you running for?" and "what are you doing out here so late[?]" Andrew then said "fuck off." Ralph said, "you think you're fucking bullshitting me, huh" before dropping his bike and shoving Andrew.

Defendant had picked up his pace as he went toward Andrew and Ralph, and could hear Ralph "yelling cuss words" aggressively. Defendant ran up to them, thinking he would scare Ralph. He saw Ralph push Andrew on the chest so that Andrew stumbled back and almost fell over. Defendant took his knife out and opened it and held it out in front of him so that Ralph could see it, because he thought Ralph was going to start beating on Andrew. Defendant also told Ralph to back off and leave his friend alone. Ralph then turned toward defendant, saying, "now you want to fight," before lunging at him. Defendant "pushed him off with [the] knife" in his right hand and also with his left hand, at the same time. Andrew had started running away before Ralph asked defendant to fight.

Defendant then stepped back and saw Andrew running down the street. As defendant started to run toward his car, Ralph said, "I'm going to fucking kill you. You're going to die." Defendant ran to his car, got inside, and saw that Ralph was riding his bike toward the car. He drove off before Ralph reached his car, and saw another car pull out and come up quickly behind his car. He soon realized the car was following him and he drove until he did not see it anymore. Defendant was scared and called Andrew, asking where he was. He then drove to Andrew's location, picked Andrew up, and drove to his own house because they were worried that Ralph might still be near Andrew's house.

After defendant and Andrew arrived at defendant's house, defendant saw that there was blood on his knife. He felt bad because he did not want to hurt Ralph, but he also felt he had no choice because he believed Ralph was

going to kill him or his friend. He cleaned the knife and hid it under his dresser along with his other knives, which he normally kept in a dresser drawer. The knife he used that night was part of a collection of 10 knives he had accumulated over the years. His parents knew he had the knives, and he had never used any of them aggressively before.

After Andrew's father called, Andrew left. Defendant asked Andrew not to involve him, to make sure he would not get into any trouble. Defendant tried to sleep, but was panicked all night. While it was still dark, he heard knocking and his mother came to his room and said the police were there. Defendant came out of his room and one of the five or six police officers who were there asked him lots of questions about what had happened. Defendant falsely told the officer, first, that he had thrown away the knife, and then that he had used a pocket knife, because he was scared he could get into trouble if he had used a big knife. The officer kept pushing defendant to say he had stabbed Ralph, but defendant wanted him to know that the stabbing happened as he was trying to push Ralph off of him. Defendant told the officer that Ralph was big and scary looking, and he sounded rough and mean.

On cross-examination, defendant testified that he did not remember telling the officer that he was scared Ralph was going to attack him. He did say he was afraid Andrew was going to get hurt. Defendant did not remember much about talking with the detectives; he said he was scared for his friend's life, but "had left out the part where he attacked me and I was scared for my life too." But, in fact, after defendant got in front of Ralph, Ralph did not take him seriously and lunged at him. Defendant was scared that Ralph, who was holding a flashlight, was going to hit him in the head or "start bashing my face in." Defendant "had no choice but to push him off me

11

with my knife still out." He did not recall if he told this to the detective, though he should have. He was panicked during the questioning. His "mind wasn't in the right place" and he was forgetting lots of details.

Defendant acknowledged that the transcript of his pre-arrest statements showed that he told the detective that when he stabbed Ralph, "I did it in a way where I pushed him off my friend at the same time." He told the officer that he was trying to protect his friend, but he did not say Ralph was lunging at him or that he was afraid Ralph was going to hurt him when he stabbed Ralph. He forgot to tell the detective that.

### Rebuttal

Detective Keown testified on rebuttal that during the questioning, defendant never said that he felt threatened for his own safety before he stabbed Ralph. Nor did he say that Ralph had lunged at him.

At the conclusion of the jurisdictional hearing, the juvenile court framed the issue it had to resolve as whether defendant acted in self-defense or defense of another. The court did not believe defendant's testimony that he acted in self-defense when he stabbed Ralph and therefore examined whether, for purposes of defense of another, he was "truly trying to protect Andrew and was it reasonable to do that." Considering the evidence, including the fact that Ralph did not have a weapon, the court concluded: "And so while [defendant] may have reasonably believed that his friend was in some sort of danger, I don't note that it was imminent danger, which is required for a self-defense claim. And I don't believe that immediate use of force was necessary, given even the push only knocked him back a couple of steps and not on the ground, and certainly using a knife to, quote, unquote, push someone was more force than was reasonably necessary to defend against whatever danger he had perceived."

12

The court therefore found that the prosecution had proven all of the allegations in the petition beyond a reasonable doubt, except for the paralysis enhancement allegation.

## DISCUSSION

### I. *Defendant's Pre-Arrest Statements to Police*

Defendant contends the juvenile court improperly admitted his pre-arrest statements to police, which were made during a custodial interrogation in violation of *Miranda*.[5]

### A. *Juvenile Court Background*

At the start of Detective Keown's direct examination during the jurisdictional hearing, when the prosecutor asked Detective Keown what defendant had said to him when questioned later on the morning of the incident, defense counsel objected on the ground of "lack of foundation regarding *Miranda* warning." The juvenile court sustained the objection and told the prosecutor to lay a foundation. A short time later, after the prosecutor asked what defendant said in response to Keown's question regarding what had occurred during the incident, defense counsel again objected on the ground of lack of foundation and the court granted counsel's request for a voir dire examination of Keown on the issue.

---

[5] Although the Attorney General describes Keown's questioning of defendant in its respondent's brief as an "interview" or a "conversation," it was in fact an *interrogation*, stemming from the brief prior investigation of the stabbing, which included Keown's interview with Andrew during which Andrew said that he saw defendant stab Ralph. The police officers thus came to defendant's home to interrogate him as a suspect in the stabbing. (See *In re Elias V.* (2015) 237 Cal.App.4th 568, 598 ["an 'interview' is 'nonaccusatory,' [and] its purpose 'is to gather information,' " while "an 'interrogation' is 'accusatory' and involves active persuasion' "].)

Keown's initial and voir dire testimony regarding the circumstances surrounding pre-arrest defendant's statements included the following: Just past 6:00 a.m. on the morning of the incident, while it was still dark, Keown and four other police officers arrived at defendant's house. Keown was wearing a marked police vest and cargo pants, and the other officers were wearing police uniforms. Keown was armed with a weapon, as were all of the other officers.

After arriving at defendant's house, Keown first spoke with defendant's mother, asking if he could come inside and contact defendant. After entering the house, Keown released one or two of the officers, and at least two of the officers remained inside the house with Keown. The officers asked defendant if they could pat him down for weapons and he consented. The officers then had defendant turn around and spread his legs, and they did a patsearch. After the patsearch, Keown either told or asked defendant to sit down at the kitchen table. Keown sat on the other side of the table, about three or four feet away from defendant and another officer stood about 10 to 15 feet behind defendant, leaning against a kitchen counter. A third officer stood beside the front door of the home, which was next to the kitchen.

Defendant's mother asked to be present during the questioning, but Keown denied her request, explaining that he wanted to talk to defendant "privately," and that he would talk to her after he finished with defendant. Defendant's mother then went down the hallway of the house into either a bedroom or bathroom. No officer was restricting her movement in the house, and she was walking around the house, getting ready for work. Toward the end of the contact with defendant, his mother was in the living room near where Keown was talking with defendant. She also went into the hallway

14

where she could hear the conversation and was "walking back and forth from him where we were at."

After sitting down at the kitchen table, defendant told Keown that he was cold and asked for a blanket. Keown grabbed a blanket off of the nearby couch and gave it to defendant, who wrapped himself in it. Keown then told defendant that he wanted to talk with him about what had occurred that night. He did not tell defendant he was a suspect or that he was under arrest. Nor did he give defendant a *Miranda* advisement. Instead, he said that defendant was not under arrest and that he was there just to ask defendant some questions.[6] Defendant was not handcuffed and no officer drew a gun during the questioning. By then, Keown had already interviewed Andrew at the police department, where Andrew said he had seen defendant stab Ralph.

After both defense counsel and the prosecutor completed their voir dire examinations, the court overruled defense counsel's objection and Keown returned to his testimony regarding defendant's pre-arrest statements. (See Factual Background, *ante*.)

Later in the hearing, defendant also testified about the circumstances surrounding the police interrogation in his home. He testified that he first heard knocking at the front door, and his mother came and told him the police were there. After he left his bedroom and after the officers patsearched him, he was shaking because he was scared and cold. The police let him have a blanket and then an officer started asking him numerous questions about the incident.

---

[6] When Keown first started questioning him, defendant asked, " 'I'm not in any trouble?' " Keown responded, " 'No. I just need to know what happened.' "

On cross-examination, defendant acknowledged that he never told the detective that he saw Ralph push Andrew, but testified that "because of the detective and the presence of other police officers, I was scared because of their presence, because I thought I was getting in trouble, and my mind was all over the place." He kept asking the detective whether he was in trouble and the detective "said no." Defendant testified that he should have also made clear to the detective that Ralph was attacking him, not just Andrew, but, during the questioning, "I was panicked. I was—my heart was racing. My mind wasn't in the right place. I was forgetting a lot of things, a lot of details. I wasn't in the right mindset to explain what had happened."

## B. *Legal Analysis*

### 1. *Applicable Legal Principles*

" 'Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole.' [Citation.] Courts have identified a variety of circumstances to be considered as part of the custody determination. Among them are 'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many

16

police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.  [Citations.]

" 'No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.' [Citation.]" (*In re I.F.* (2018) 20 Cal.App.5th 735, 759 (*I.F.*), quoting *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

"In juvenile cases, the same factors still apply, but with an added consideration.  In *J.D.B. v. North Carolina* (2011) 564 U.S. 261, [277,] the United States Supreme Court concluded that a child's age may be considered in the *Miranda* analysis, 'so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer.' [Citation.]  The court recognized that, 'a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.' (*Id.* at p. 272 [citation].)  Although age may not be a significant factor in every case, the court observed, common sense dictates that 'children cannot be viewed simply as miniature adults.' (*J.D.B.*, *supra*, at pp. 262 & 274.)  Accordingly, the court concluded that 'a child's age properly informs the *Miranda* custody analysis.'  (*Id.* at p. 265.)" (*I.F.*, *supra*, 20 Cal.App.5th at p. 760.)

## 2. *The Police Interrogation of Defendant Was Custodial*

Review of the juvenile court's ruling on this issue presents a mixed question of law and fact, and we generally review the court's "factual findings regarding the circumstances surrounding the interrogation . . . for substantial evidence and we independently decide whether, given those circumstances, a reasonable person in [the] minor's position would have felt free to end the questioning and leave. [Citation.] The prosecution bears the burden of proving that the defendant was not in custody in order to use his statements against him. [Citation.]" (*I.F.*, *supra*, 20 Cal.App.5th at p. 760.)

In this case, the juvenile court merely overruled defense counsel's objection to admission of evidence of defendant's pre-arrest statements to Keown, without explaining the reasons for its ruling. Nor did the court listen to the recording of the interrogation or read the full transcript. Thus, because the court made no factual findings about the circumstances of the interrogation based on Keown's voir dire testimony or information gleaned from the recording, we have no reason to defer to the court on this issue and will independently review the record and apply the relevant law. (See *I.F.*, at p. 760.)[7]

Looking at the circumstances relevant to determining whether defendant was in custody at the time of the police questioning for *Miranda* purposes, certain factors point to a lack of custody. First, because defendant has failed to include the recording of the interrogation in the record on appeal, we will presume that Keown's tone of voice during the questioning

---

[7] In addition, because defendant failed to include either the recording or transcript of the interrogation in the record on appeal, our determination of whether defendant was in custody when he made the statements at issue is necessarily based solely on testimony regarding the interrogation that is included in the record on appeal.

was calm and professional, and that the interrogation was not particularly lengthy. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 759.) In addition, defendant was told at the start of the interrogation that he was not under arrest, and the police officers who were present did not handcuff him or unholster their weapons. (See *In re Anthony L.* (2019) 43 Cal.App.5th 438, 446 (*Anthony L.*) [factors consistent with a noncustodial interrogation included officer telling 15-year-old suspect that he was " 'not under arrest right now' "].)

Many other circumstances, however, support a finding that the police interrogation *was* custodial. First, it was initiated by police, who had just heard from Andrew that defendant stabbed Ralph. Thus, the purpose of the interrogation was to question defendant as a suspect in the stabbing. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 759; see also *People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1164, citing *People v. Stansbury* (1995) 9 Cal.4th 824, 832 [fact that police did not view defendant as a suspect and officer told him "he desired to question him *as a possible witness*" were factors indicating noncustodial interrogation].) The limited evidence in the record regarding Keown's pre-arrest questioning of defendant reveals that from the initial patdown through the entire interrogation he was attempting to get defendant to admit that he stabbed Ralph and to provide additional incriminating information. (See *I.F.*, at p. 775 [during questioning, officers "repeatedly challenged [minor's] account of the morning of the murder"].)

For example, on cross-examination, Keown acknowledged having the following exchange with defendant during the questioning. After defendant said, " 'I pushed the guy with the knife,' " Keown said, " 'So what's another word for that?' " and defendant responded, " 'Uh, I guess I stabbed him in the shoulder.' " The evidence also shows that Keown exerted pressure on defendant, as when he testified that defendant initially said that he had

19

thrown away the knife used in the stabbing, but "then we worked to the point where he brought it home and he cleaned it and it was in his bedroom." (See *I.F.*, *supra*, 20 Cal.App.5th at p. 759; *People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1164 [" '[a]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect that he is not free to leave' than would general and neutral investigative questions"].)

Other circumstances suggesting that the interrogation was custodial include the facts that five officers arrived at defendant's home at 6:00 a.m., on the morning of the incident, while it was still dark outside. Although defendant's mother consented to police questioning of defendant, defendant— who was in bed when the officers arrived—did not. (See *Anthony L.*, *supra*, 43 Cal.App.5th at p. 446 ["No one asked 15 year old if he wanted to speak with the police; rather, Mother brought the two officers into Minor's bedroom as he was sleeping"]; *I.F.*, *supra*, 20 Cal.App.5th at p.774 [minor's parents agreed to interview, but "no one appears to have asked [minor] whether he wanted to be interviewed"].) Instead, after being roused from his bed, defendant was patsearched for weapons before being directed to sit at his kitchen table.

In addition, while Keown had released one or two of the officers at that point, at least two uniformed police officers and Keown—who wore a police vest—remained in the home throughout the interrogation. All of them were armed with guns. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 759.) During the questioning, one officer stood behind defendant and a second officer stood beside the front door of the home, which was next to the kitchen, while Keown sat across from defendant at the kitchen table. (See *Anthony L.*, *supra*, 43 Cal.App.5th at p. 447 [fact that officers stood near bedroom door during questioning in minor's bedroom was one factor suggesting minor was

20

in custody during interrogation].)  Moreover, when defendant requested a blanket, instead of permitting him to go retrieve one, Keown took a blanket from the living room couch and handed it to him at the kitchen table, which would reasonably suggest to defendant a restriction on his freedom of movement.  (See *ibid*.)  All of these circumstances would have suggested to defendant that he was not free to leave the kitchen or the house itself.  (See *Miranda, supra*, 384 U.S. 436, 444 [*Miranda* advisement is required when person being interrogated is "in custody or otherwise deprived of his freedom of action in any significant way"]; *I.F.*, at p. 759.)

In addition, while Keown initially told defendant he was not under arrest, he never said that defendant was free to terminate the interrogation or leave at any time.  (See *Anthony L.*, *supra*, 43 Cal.App.5th at p. 446 [factors suggesting minor was in custody included officers' failure to tell him "he was free to leave, and nothing in his conduct suggest he thought he could do so"]; *I.F.*, *supra*, 20 Cal.App.5th at p. 772 [officers' failure to inform 12-year-old child "that he was free to terminate the interview and leave strongly supports the conclusion that the . . . interview was custodial"]; compare *In re Kenneth S.* (2006) 133 Cal.App.4th 54, 65 [lack of custodial interrogation shown by evidence that at start of interview at police department, detective "thanked [minor] for voluntarily appearing and told him that he was not under arrest and was free to leave at any time he wanted"].)

Because defendant was a minor at the time of the interrogation, another factor to consider in determining whether he would feel free to terminate the encounter is his age.  (See *I.F.*, *supra*, 20 Cal.App.5th at p. 760.)  Although the evidence in the record does not reveal whether the officers were aware of defendant's precise age, the Attorney General does not argue that the police were unaware that defendant was a minor.  Moreover,

based on the surrounding circumstances, including the facts that Keown had already interviewed defendant's then 17-year-old friend; that defendant lived with his mother and the officers asked her, rather than defendant himself, for permission to speak with him; and that he was physically small, it would be " 'objectively apparent to a reasonable officer' " that defendant was a minor. (*Ibid*.)  We therefore find that, although he was not a young child, defendant's age of 17 would certainly have intensified the effect of the factors just discussed in causing him to feel "pressured to submit" to the police interrogation.  (*Ibid*.)

Considering that defendant was still a minor, living at home with his mother, it is particularly significant that when his mother asked to be present for the questioning, Keown denied her request.  (See *United States v. Craighead* (2008) 539 F.3d 1073, 1087 (*Craighead*) [" 'A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements' "].)  Although the Attorney General points to testimony showing that defendant's mother was not relegated to a distant location in the house, and instead moved freely throughout other parts of the home as she got ready for work and could hear parts of what was said, the fact that she was expressly prohibited from remaining in the kitchen with her minor son during the police questioning plainly weighs in favor of finding that the interrogation was custodial.  (See *I.F.*, *supra*, 20 Cal.App.5th at p. 773 [restrictions on minor's father's "freedom of movement, if known to [minor], might reasonably have led a 12 year old in [minor's] position to feel more restricted than otherwise"]; cf. *Craighead*, at p. 1087 [fact that officers "excluded non-law enforcement" from storage room where defendant was

22

being interrogated "reinforces our understanding that the [officers] controlled [defendant's] environment; it is difficult to see how [he] was free to leave if he was, apparently, not free to invite others into the storage room of his own house"].)

Finally, the record reflects that defendant was arrested at the conclusion of the interrogation. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 759; see also *Anthony L.*, *supra*, 43 Cal.App.5th at p. 447 [finding that defendant's arrest at the end of the questioning was a factor suggesting custody].)

The Attorney General makes much of the fact that defendant was in his own home during the interrogation, which purportedly means that he would have felt less intimidated or coerced to speak with police. (See *Craighead*, *supra*, 539 F.3d at p. 1083 ["courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature" because "[t]he element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings"].)

In *Craighead*, the Ninth Circuit Court of Appeals considered "the extent to which the circumstances of [an] interrogation turn[] the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.' " (*Craighead*, *supra*, 539 F.3d at p. 1083.) The court found that the circumstances that transform a home in such a way include the number of law enforcement personnel and whether they were armed, whether the suspect was at any point restrained, whether the suspect was isolated from others, and whether the suspect was informed that he was free to leave or terminate the interrogation. (*Id.* at p. 1084.) The *Craighead* court concluded that the interrogation of the defendant in that case was custodial where eight armed law enforcement officers entered his home to execute a search warrant, interrogated him in a back storage room with the door closed and

23

guarded by one of the officers, and excluded non-law enforcement individuals. These factors turned the defendant's home into a police-dominated environment notwithstanding the fact that he was told that his statements were voluntary and he was free to leave. (*Id.* at pp. 1084–1089.)

In this case, as we have already explained, *ante*, the circumstances of the interrogation of defendant indicate that, like the defendant in *Craighead*, defendant's home was transformed into a "police-dominated atmosphere" during the interrogation, which led defendant to reasonably believe he was not free to leave his kitchen or otherwise end the interrogation. (*Craighead*, *supra*, 539 F.3d at p. 1084.) Indeed, the fact that the police questioning took place in defendant's home may even have exacerbated the problem. (Cf. *id.* at p. 1083 ["To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home"].)

In conclusion, considering " 'the interplay and combined effect' " of all of the circumstances surrounding the police interrogation, we find, on balance, that the police officers in this case " 'created a coercive atmosphere such that a reasonable 17 year old would have experienced a restraint tantamount to arrest.' " (*I.F.*, *supra*, 20 Cal.App.5th at p. 759.) The juvenile court therefore erred in admitting evidence related to the pre-arrest interrogation of defendant.

### 3. *The* Miranda *Violation Was Prejudicial*

Having found that the juvenile court erred in admitting evidence of defendant's pre-arrest statements to police, which were obtained in violation of *Miranda*, we now must review the error under the federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, to determine "whether the error was harmless beyond a reasonable doubt—that is, whether it is clear beyond a reasonable doubt that use of the statement did not contribute

to the verdict. [Citation.] Under this test, the appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621; see *I.F.*, *supra*, 20 Cal.App.5th at p. 781 [" 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the [trier of fact] considered on the issue in question' "].) The prosecution bears the burden of proving the error was harmless under *Chapman*. (*I.F.*, at p. 781.) For the reasons discussed below, we conclude the Attorney General has not satisfied its burden of proving the error in this case was harmless beyond a reasonable doubt.

Before it found the allegations in the petition true at the conclusion of the jurisdictional hearing, the juvenile court heard a great deal of testimony focused on defendant's lack of credibility. This included the lengthy cross-examination of defendant on this issue and Keown's testimony—both in the prosecutor's case in chief and on rebuttal—much of which emphasized defendant's failure to say anything about his fear for himself or his belief in a need for self-defense in his statements to Keown, as well as on his lies and evasions during the police questioning. In addition, the prosecutor focused on defendant's statements to police in his closing argument and rebuttal, reading portions of the transcript of the interrogation to show that defendant never said anything to Keown about Ralph lunging at him or his belief in a need to defend himself. The prosecutor also referred to defendant's pre-arrest statements to argue that he had lied both to the police and on the witness stand.

25

At the end of the jurisdictional hearing, the court observed that "each of the witnesses who were part of this incident all had credibility issues," including Ralph, who admitted drinking that night and had "some inconsistencies about meth use," as well as defendant and Andrew, both of whom admitted lying to police. Defendant and Andrew also testified that defendant told Andrew not to get him involved, which the court found showed that defendant "was trying to persuade someone else not to tell the truth about what happened. So I would find that [defendant], to me, had the most credibility issues out of all of the witnesses that I heard during this trial." The court also discounted defendant's claim that he acted in self-defense based on the fact that, during the police interrogation, "[i]t certainly was not told to the officer, and that would have been the time to get yourself out of it" by saying that Ralph had lunged at him. The court's comments reflect that it relied—not exclusively, but in large part—on defendant's pre-arrest statements to Keown in determining that his testimony was not credible. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 782 [although juvenile court found other evidence of guilt persuasive, it "appear[ed] to have viewed all of the evidence . . . through the lens of [the minor's] inconsistent statements"].)

The Attorney General maintains that even had the juvenile court excluded the evidence of defendant's pre-arrest statements from the prosecution's case in chief, evidence of what he told Keown would still have been admissible to impeach any of his hearing testimony that was inconsistent with his prior statements. (See *Oregon v. Elstad* (1985) 470 U.S. 298, 307 ["Failure to administer *Miranda* warnings creates a presumption of compulsion," which, "though irrebuttable for purposes of the prosecution's case in chief," does not bar use of inconsistent pre-arrest statements "for impeachment purposes on cross-examination"].) In particular, according to

the Attorney General, defendant's testimony about Ralph lunging at him and his belief in the need to protect himself could have been countered with evidence that in his statements to police, he never mentioned that Ralph lunged at him or that he stabbed Ralph because he believed Ralph was about to harm him. The Attorney General therefore maintains that to the extent the evidence of defendant's statements was erroneously admitted during the prosecution's case in chief, rather than for impeachment purposes following defendant's inconsistent testimony, the error was harmless beyond a reasonable doubt. (See *People v. Wood* (2002) 103 Cal.App.4th 803, 810.)

Defendant, on the other hand, asserts that had the court excluded evidence of his pre-arrest statements, he may well have decided not to testify at the jurisdictional hearing, and that nothing in the record supports the Attorney General's claim that defendant would have testified in any event, thereby leaving himself open to impeachment with his prior statements.

*People v. Bradford* (2008) 169 Cal.App.4th 843, 855, sheds light on this question. In that case, the record did not reflect whether the defendant would have testified had his improperly admitted confession been excluded or, if he had testified, whether the confession would have been admitted for impeachment purposes. Division One of this District therefore declined to engage in speculation about "the parties' tactical choices," concluding that "[b]ecause it is impossible to determine what might have happened had the trial proceeded differently . . . , prejudice should be evaluated on the basis of the evidence actually presented, while excluding the improperly admitted confession." (*Ibid.*) In this case too, the record does not reflect whether defendant would have testified had evidence of his statements to Keown been excluded or whether the statements would have been admitted for impeachment purposes. It is therefore appropriate to include all evidence

27

presented at the hearing that did not relate to defendant's pre-arrest statements in our evaluation of prejudice. (See *Bradford*, at p. 855.)

The court's true findings at the conclusion of the jurisdictional hearing were based on its determination that defendant was not acting either in self-defense or in defense of Andrew when he stabbed Ralph. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [When a defendant uses force against a person in lawful self-defense or defense of another, he or she is not guilty of the crime charged]; see also CALCRIM No. 3470.)[8] The court's

---

[8] CALCRIM No. 3470, which addresses the right to self-defense or defense of another in non-homicide cases, instructs that a defendant acted in lawful self-defense or defense of another if:

"1. The defendant reasonably believed that [he or someone else] was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully];

"2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶]

"3. the defendant used no more force than was reasonably necessary to defend against that danger."

CALCRIM No. 3470 continues in relevant part: "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was . . . imminent danger of bodily injury to [himself or someone else or] an imminent danger that [he or someone else] would be touched unlawfully. . . . Defendant's belief must have been reasonable and (he/she) must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful [self-defense or defense of another].

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

28

stated reasons for this determination included, in addition to his lack of credibility due to his pre-arrest statements, its observation as to the self-defense claim that Andrew had never said that Ralph lunged at defendant, and its finding that defendant's testimony that he stabbed Ralph after Ralph lunged at him did not make sense, given the length of the knife blade. As to the defense of another claim, the court found defendant's conduct unreasonable both because Andrew did not even fall to the ground after Ralph pushed him, and because Ralph did not have a weapon, which the court believed showed that Andrew was not in imminent danger and that defendant used more force than was necessary.

Despite the court's additional reasons for disbelieving defendant and finding his fear of harm unreasonable, considering the emphasis during the jurisdictional hearing on defendant's pre-arrest statements—which constituted such a large part of the prosecution's case, the cross-examination of defendant, and the prosecutor's closing argument, and which so clearly troubled the juvenile court—we do not believe the court could have evaluated the totality of the evidence presented at the hearing on these issues without

---

"[The slightest touching can be unlawful if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.] [¶] . . . [¶]

"[A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of (death/bodily injury/ _____ <insert crime>) has passed. This is so even if safety could have been achieved by retreating.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful [self-defense or defense of another]. If the People have not met this burden, you must find the defendant not guilty of _____ <insert crime(s) charged>."

29

being influenced to some degree by the evidence of defendant's inconsistencies, lies, and evasions during his pre-arrest statements to police. (See *I.F.*, *supra*, 20 Cal.App.5th at p. 782 [finding erroneous admission of minor's multiple custodial statements were prejudicial where "prosecutor emphasized the inconsistencies in [minor's] statements in closing argument" and the "juvenile court was clearly struck by the inconsistencies in [his] statements"]; *People v. Cruz* (1964) 61 Cal.2d 861, 868 ["There is no reason why we should treat this evidence as any less 'crucial' than the prosecutor— and so presumably the [trier of fact]—treated it"]; accord, *People v. Diaz* (2014) 227 Cal.App.4th 362, 384.)

The influence of the pre-arrest statements on the court's perceptions of defendant's credibility is of particular concern because, looking at all of the relevant circumstances surrounding the stabbing incident, absent the evidence of defendant's pre-arrest statements, the evidence presented would have been sufficient to support a finding that a reasonable person in defendant's particular situation would believe in the need to protect Andrew and/or himself from imminent harm. (See CALCRIM No. 3470 ["When deciding whether the defendant's beliefs were reasonable, we consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed"]; accord, *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1083.)

Those relevant circumstances included the following. The encounter with Ralph took place in the dark, early morning. Ralph—who was much bigger than either of the two 17 year olds and weighed 100 pounds more than defendant—behaved in a strange and unpredictable manner, which suggested that he was mentally ill or under the influence, and Ralph had in

30

fact recently ingested alcohol and methamphetamine. Ralph was oddly fixated on Andrew due to his belief that Andrew had done something wrong. This belief led him to aggressively question, chase, and again antagonistically confront and push Andrew, causing Andrew to fall backwards several steps. Both Andrew and defendant were frightened by Ralph's erratic and aggressive behavior. After defendant approached and told Ralph to leave Andrew alone, Ralph, still holding his flashlight and behaving aggressively, turned on defendant. Defendant then stabbed Ralph in the arm. All of these events happened in very quick succession. (See CALCRIM No. 3470.)

It is true that defendant's testimony, together with the testimony of Andrew and Ralph, could *also* support a finding that defendant did not act in lawful self-defense or defense of Andrew. But, had it not "viewed all of the evidence . . . through the lens of" defendant's pre-arrest lies and inconsistent statements, it is far from certain that the court would have found that the stabbing did not result from defendant's reasonable belief in the need to protect himself and/or Andrew from serious harm. (*I.F.*, *supra*, 20 Cal.App.5th at p. 782; see *People v. Boyer* (1989) 48 Cal.3d 247, 279–280 [improper admission of defendant's statement at trial was not harmless beyond a reasonable doubt even though remaining evidence of his involvement in charged murder "was undeniably strong"], disapproved on another ground in *People v. Stansbury*, *supra*, 9 Cal.4th at p. 830, fn. 1.) Because we are unable to confidently say that the evidence of guilt in this case was so overwhelming that the court's true findings were " 'surely unattributable' " to the admission of defendant's pre-arrest statements, the error was not harmless beyond a reasonable doubt. (*People v. Quartermain*, *supra*, 16 Cal.4th at p. 621; see also *I.F.*, at p. 781 [a *Miranda* error does not

31

contribute to a verdict only if court finds " 'that error unimportant in relation to everything else' " trier of fact considered on issue in question].)

Accordingly, because the Attorney General has failed to satisfy its burden of proving the error in admitting evidence of defendant's pre-arrest statements was harmless beyond a reasonable doubt, we must reverse the jurisdictional findings and dispositional order.[9]

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are reversed.

---

[9] In light of this result, we will not address the two additional contentions defendant has raised in this appeal, both of which are particular to the jurisdictional findings and dispositional order that we are reversing.

                                 _____

                                 Kline, P.J.

We concur:

_____

Stewart, J.


_____

Miller, J.

*In re Matthew W.* (A159931)

Trial Court:                                  Napa County Superior Court

Trial Judge:                                Hon. Monique Langhorne-Johnson

Attorney for Defendant and Appellant:  By Appointment of the Court of Appeal
First District Appellate Project

Tony L. Cheng
Youth Defender Clinic
A Clinic of the UC Berkeley School of Law

Attorneys for Plaintiff and Respondent:  Attorney General of California
Xavier Becerra

Lance E. Winters
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Katie L. Stowe
Deputy Attorney General

Elizabeth W. Hereford
Deputy Attorney General