Filed 1/14/25  P. v. Hart CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JERALD HART,<br><br>    Defendant and Appellant. | B331688<br>(Los Angeles County<br> Super. Ct. No. BA480579) |

APPEAL from an order of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Jerald Hart appeals from a judgment sentencing him to life without parole after a jury found him guilty of special circumstance first-degree murder.  He contends: (1) the trial court erred by failing to exclude a recorded statement allegedly procured in violation of his *Miranda*[1] rights; (2) the prosecutor and investigating detective violated the Racial Justice Act (RJA) by invoking racial stereotypes; (3) the coroner's testimony about the victim's injuries was inadmissible hearsay; and (4) admission of the coroner's testimony violated his Sixth Amendment right to confrontation.  Defendant also asks that we independently review the in camera record of the *Pitchess*[2] hearing, and we have done so.  We affirm the judgment.

# FACTUAL BACKGROUND

I.    *Prosecution's Evidence*

On April 9, 1980, firefighters responded to C.B.'s home on Brighton Avenue in Los Angeles after smoke was reported coming from the roof.  When firefighters entered the home, they found C.B. dead on her bedroom floor.  She was 79 years old at the time.  Her body "from the torso up was heavily burned, incinerated," and "it was only her lower extremities that were recognizable and were relatively undamaged."  She was naked from the waist down.  There was a "crucifix protruding out from her mouth," and blood on her "vaginal area" as well as her thigh.  Razar marks were apparent on her leg.  The house appeared to have been ransacked.  In the kitchen, an American flag and yardstick were on the floor, and there was a pool of blood.

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

There was also blood on the kitchen wall, cabinets, and rug. A three-inch circular hole was cut out of the wire mesh of C.B.'s back screen door, apparently to gain access to the latch.

A "rape kit" was collected from C.B.'s body. Latent fingerprints were lifted throughout the home, including a fingerprint from the back screen door. After processing the prints, there were no viable matches. Although multiple blood samples were taken, testing for DNA did not exist at the time. Law enforcement canvased the neighborhood and investigated similar cases. Despite police efforts to find a suspect, the matter became a cold case, that is, unsolved but inactive.

In 2018, Detective Ross of the Los Angeles Police Department was assigned this cold case. He requested certain evidence screened for blood as well as processed the fingerprint evidence. The fingerprint lifted from the back screen door of C.B.'s home matched defendant's, which was stored in a federal database. Based on this match, a DNA reference sample was taken from defendant. Defendant's DNA matched the sperm recovered from C.B.'s vaginal swab from the rape kit. As for the blood evidence, some of the DNA samples were too small to determine a match while other samples matched with C.B. only. Detective Ross then determined that defendant lived across the street from C.B. on Brighton Avenue at the time of her death. He was 19 years old at the time.

Detective Ross and his partner subsequently met with defendant at his home (now) in Louisiana. Defendant confirmed he used to live on Brighton Avenue with his parents. He gave detailed responses about various neighbors. For example, he recalled that "Mr. and Mrs. Jones" lived in a nearby house. They died, their daughter continued to live there, but then lost the house. A Latino family moved in and made defendant tamales.

3

Defendant said he had another neighbor named Pat, who he "mess[ed]" around with, but she was too aggressive for him. He also stated he had a girlfriend named Yolanda who lived in the neighborhood. Yolanda's brother had caught them in bed. When asked if he knew C.B., defendant replied that he never associated with her but knew she had a husband. Defendant did not know her race or her husband's. All he could recall was that her husband had a "old big '56 Chevy." Defendant had no recollection of a house in the neighborhood catching fire. Detective Ross then showed defendant a photograph of C.B. Defendant stated he did not recognize her or have any contact with her, and had never been inside her house. Defendant emphatically stated that he was telling the truth. Despite being told his sperm was found in C.B.'s vagina, defendant did not change his responses. When asked, defendant denied killing or raping C.B.

The arson investigator testified that four separate fires were intentionally set throughout C.B.'s house. He opined that the person who started the fire intended to conceal or destroy evidence and prevent identification of himself as the suspect. Dr. Eugene Carpenter conducted the autopsy of C.B. in 1980. At the time of trial, Dr. Carpenter was deceased. Dr. Raffi Djabourian, a deputy medical examiner at the Los Angeles County Coroner's Office, reviewed Dr. Carpenter's autopsy report and related documents. He confirmed a "cloth type gag" and crucifix were lodged in C.B.'s mouth, and C.B.'s body was burned postmortem. Dr. Djabourian testified C.B. had injuries to her vaginal area and a laceration on her anal area. Specifically, there was "swelling of the labia of the external genitalia" and perineum. There was also a two inch bruise at the top of the labia of the vagina. These injuries were indictive of sexual trauma and occurred prior to her death. C.B. had some fractures on the left side of her ribcage in four

4

areas and one on the right side of her ribcage. She had some scrapes and bruising on her back and near the back of the right knee as well as in the hip area. Dr. Djabourian opined C.B.'s cause of death was the "combined effects of asphyxia and blood loss due to suffocation and blunt force trauma with a possible contributory factor of strangulation." The manner of death was homicide.

## II. *Defense Evidence*

Defendant testified in his own defense. In 1970, he moved with his family to Brighton Avenue. Defendant denied raping, beating, or killing C.B. or burglarizing her home. Defendant first interacted with C.B. when he was 19 years old. He had helped C.B. with her groceries and brought them inside through her back door. They drank wine together and then he left.

Shortly thereafter, defendant and C.B. struck up a friendship. Defendant did work on her porch and they would drink wine together. During one interaction, C.B. "reached over and grabbed [his] penis." C.B. then took defendant in her bedroom and tried to have sex with him but defendant refused and he left her house. Defendant continued to come over to C.B.'s house to do handy work. At a later date, C.B. "groped" defendant again and they went into her bedroom. C.B. was naked from the waist down and defendant "pulled out [his] penis and . . . stuck it in her" and "just pumped a couple times and . . . ejaculated." Defendant was embarrassed and left through the back door. The next day, police were on his street and defendant was told C.B. was killed.

Defendant testified that he did not tell Detective Ross and his partner that he knew C.B. and that he was at her house because she had told him to never "tell anyone that [they] were together." If defendant knew he was a

5

suspect, he would have told the detectives everything. Defendant did not recognize C.B. in the photographs shown to him by the detectives. He testified that he never saw C.B.'s face, even though he helped her around her house and had sex with her.

A nurse practitioner reviewed C.B.'s autopsy report and other related reports. Some of the documented injuries did not have corresponding photographs. She had no reason to believe the findings about C.B.'s injuries were false, but she did not have the relevant photographs for comparison. She opined that some of the documented injuries to C.B.'s vagina could have been caused by something other than rape, such as consensual sex, trauma, or infection. Also, there was no conclusive way to determine if all of the injuries to C.B.'s vagina were inflicted at the same time. Similarly, the observations in the autopsy report about the vaginal area were not only consistent with a sexual assault.

## PROCEDURAL HISTORY

A jury found defendant guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[3] The jury found true the allegations that the murder was committed during the commission of rape and burglary. (§ 190.2, subd. (a)(17).) The trial court sentenced defendant to life without the possibility of parole.

Defendant appealed.

---

[3] All further statutory references are to the Penal Code unless otherwise provided.

## DISCUSSION

I.    *Defendant's Recorded Statement*

Detective Ross and his partner conducted a recorded interview with defendant at his home in Louisiana prior to his arrest.  On appeal, defendant contends that the trial court committed prejudicial error by failing to exclude his recorded statement because he had not been given a *Miranda* warning.

"A defendant who is in custody . . . must be given *Miranda* warnings before police officers may interrogate him." (*People v. Haley* (2004) 34 Cal.4th 283, 300.)[4]  Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444.)  "Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?  [Citations.]  The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. omitted.)

As the Attorney General correctly notes, defendant forfeited the *Miranda* argument on appeal.  Although defense counsel initially moved to exclude defendant's recorded statement, she subsequently withdrew her

---

[4]    "As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 947, quoting *Miranda, supra*, 384 U.S. at p. 479.)

request.[5] Thus, defendant cannot raise this issue on appeal. (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 33–34 [defendant's failure to object under *Miranda* forfeited the argument on appeal]; see *People v. Seaton* (2001) 26 Cal.4th 598, 656 [same]; see *CDN Inc. v. Kapes* (9th Cir. 1999) 197 F.3d 1256, 1258 ["[t]he '"withdrawal of an objection is tantamount to a waiver of an issue for appeal"'"].)

To the extent defendant contends in his reply brief that he objected to the admission of his recorded statement at trial, we are not persuaded. Defendant points to a colloquy outside the presence of the jury between counsel and the trial court. The crux of the conversation pertained to the prosecutor's intention of eliciting statements from defendant about his general understanding of his rights and obligations when talking with the police. This is irrelevant to the issue of the admission of defendant's recorded statement with the detectives. We also note there appears to be no formal objection to this line of questioning.

Even if the contention had not been forfeited, we conclude the interview was not a custodial interrogation and therefore did not require a *Miranda* warning. Generally, "courts have . . . been much less likely to find that an interrogation in the suspect's home was custodial in nature." (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1083.) While this is not to say

---

[5] In his opening brief, defendant omits the critical fact that defense counsel withdrew her motion to exclude the recorded statement. This undermines the credibility of the claim that there was an objection to this evidence. In addition, the trial court only "tentatively" ruled defendant's recorded statement admissible after defense counsel withdrew her motion. Defendant's portrayal of the trial court's action as a final ruling lacks candor. Prior to issuing the tentative order, the applicability of *Miranda* was never fully litigated, and the facts surrounding whether the interview was custodial were not fully developed below.

that an interview inside the home cannot have the trappings of a custodial interrogation, the necessary facts to rise to such a level are not present here. (E.g., *Orozco v. Texas* (1969) 394 U.S. 324, 325–327 [*Miranda* warnings were required when officers entered defendant's room at a boardinghouse at 4:00 a.m., awakened him, began questioning him, and advised him he was under arrest and was not free to leave]; *Craighead, supra*, 539 F.3d 1073 [suspect detained inside the home by eight officers, some of whom unholstered weapons, and was questioned in back room of house with entry blocked by officer].)

Defendant agreed to speak with the two detectives at his home. The detectives informed defendant they were looking into an incident that happened in his old neighborhood. During the interview, the detectives' firearms were concealed, and defendant spoke to them willingly. The majority of the interview was a free flowing conversation about the neighborhood. At the end, Detective Ross asked defendant if he was being truthful about not knowing C.B. because his semen was found "in her vagina" and further inquired whether he murdered, raped, sodomized or strangled her. (See *People v. Moore* (2011) 51 Cal.4th 386, 402 ["police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody"].) Detective Ross made it clear defendant was not under arrest, thanked defendant for voluntarily speaking with them, and left. Given the totality of the circumstances, we conclude there was no *Miranda* violation in admitting the recorded interview.

9

II.     *Racial Justice Act*

Defendant is African American.  On appeal, he contends Detective Ross and the prosecutor violated the RJA by using racial stereotypes of African American men as sexually promiscuous predators and liars.[6]

A. *Legal Principles*

The RJA, which took effect January 1, 2021, provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin."  (§ 745, subd. (a).)  The RJA was passed with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing."  (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (i).)  The Legislature's goal was "to provide remedies that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination."  (*Id.*, § 2, subd. (j).)  The Legislature recognized that "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias" and specified that its intent was "not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system."  (*Id.*, § 2, subd. (i).)

The RJA specifies four categories of conduct, any one of which, if proven by a preponderance of the evidence, establishes a violation.  (§ 745,

---

[6]     In the interest of judicial efficiency, as we do not reach  defendant's later claim that the failure to bring a motion under the RJA constituted ineffective assistance of counsel, we analyze the merits of defendant's argument without addressing the Attorney General's forfeiture argument. (*People v. Williams* (1998) 61 Cal.App.4th 649, 657, citing, e.g., *People v. Marshall* (1996) 13 Cal.4th 799, 831.)

subd. (a)(1)–(4).)  As relevant here, a violation occurs when a "law enforcement officer . . . exhibited bias or animus towards the defendant because of the defendant's race . . . ."  (§ 745, subd. (a)(1).)  Similarly, a violation also occurs when, "[d]uring the defendant's trial, in court and during the proceedings, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race . . . or otherwise exhibited bias or animus towards the defendant because of the defendant's race . . . whether or not purposeful.  This . . . does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect."  (§ 745, subd. (a)(2).)

In turn, the statute defines "'[r]acially discriminatory language'" as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin."  (§ 745, subd. (h)(4).)  "Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."  (*Ibid.*)

B. *Analysis*

Relying on subdivision (a)(1) of section 745, defendant argues Detective Ross "evoked" the racial stereotype of African American men as sexually promiscuous predators and liars during his interview.  As to the stereotype of sexual promiscuity, defendant relies on statements that he made to Detective Ross about his sexual relations with two of his female neighbors.  These

11

statements were only given in response to the detective's general inquiry about defendant's recollection of the neighborhood. A defendant's voluntary statements potentially invoking a stereotype of African American men is not a violation of the RJA. Only a specific list of persons could potentially violate the RJA and a defendant is not one of them. (See § 745, subd. (a)(1), (2).) Similarly, defendant points to his own trial testimony espousing his belief that Detective Ross was biased against African Americans and regarded them as a "race of liars." Again, defendant's statement (let alone his belief) invoking a racial stereotype is not a RJA violation.[7] In support of his claim of a RJA violation, defendant highlights Detective Ross telling defendant that he was "not being truthful" during the interview. It is clear from the record that this accusation against defendant was wholly based on defendant's denials of knowing or interacting with C.B. despite the forensic evidence to the contrary. After accusing defendant of not being truthful, the detective then stated he knew defendant was inside C.B.'s house and that defendant's semen was "inside [C.B.'s] vagina." In any event, Detective Ross's statement that defendant was not being truthful, standing alone, is not sufficient to demonstrate bias or animus towards defendant because of his race.[8]

---

[7] Similarly, the prosecutor eliciting questions on cross-examination about defendant's belief regarding Detective Ross's bias was relevant to the purpose of undermining defendant's credibility. (§ 745, subd. (a)(2).)

[8] Defendant contends Detective Ross references the birth of his first child (Tyrone) when defendant was 17 years old. He misstates the record. The detective simply mentioned the birth of "Tryone" to orient defendant on the timeframe of the fire at C.B.'s house, which defendant claimed he could not recall. There was also no mention that Tyrone was his child or that defendant was 17 years old when he was born. While the prosecutor later mentioned Tyrone was defendant's son in recounting the timeline of the fire, it was not mentioned for the purpose of demonstrating defendant's promiscuity but again, to establish a timeline. (See § 745, subd. (a)(2) [the

Citing to subdivision (a)(2) of section 745, defendant further argues the prosecutor elicited testimony from him that invoked the same racial stereotypes (promiscuity and lying), which were then reinforced in her closing arguments. His contentions lacks merit. Defendant brought his sexual relationships, specifically with his neighbors, to the forefront of the trial. In describing his neighbors to the detectives, he volunteered his sexual relationships with two of them. Despite denying any knowledge or contact with C.B. to detectives, he later testified he had a consensual sexual relationship with C.B. (albeit he claimed he never saw her face). The prosecutor elicited and used these conflicting statements, in conjunction with the evidence, to demonstrate defendant was not credible, his explanations were not reasonable, and he was not telling the truth. Moreover, any statements elicited about his general sexual history were done to debunk defendant's testimony that he had a consensual sexual relationship with C.B., a woman 60 years his senior. Defendant fails to tie any racial animus or bias to the prosecutor's actions. Likewise, the prosecutor's references to defendant as a liar in closing arguments were based on the weight of the evidence as well as his conflicting statements. As previously stated, the RJA does not apply if the person (here, the prosecutor) is relating language used by another (here, defendant) that is relevant to the case. (§ 745, subd. (a)(2).)

Therefore, we conclude defendant has failed to prove a violation of the RJA by a preponderance of the evidence.

---

RJA does not apply if the person is relating language used by another that is relevant to the case].)

13

III.   *Hearsay*

Defendant argues the trial court erred in permitting Dr. Djabourian (who did not conduct C.B.'s autopsy) to testify about case-specific facts from the autopsy report prepared by a non-testifying coroner on hearsay grounds.

Prior to trial, defense counsel filed a motion to exclude Dr. Djabourian's testimony as inadmissible hearsay under state law.  (See *People v. Turner* (2020) 10 Cal.5th 786, 821 [holding medical examiner's testimony relating observations recorded by nontestifying pathologist about case-specific facts constituted inadmissible hearsay].)  At a pretrial hearing, instead of addressing defendant's hearsay objection, the trial court addressed whether the findings in the autopsy report were testimonial (i.e., the potential violation of defendant's Sixth Amendment right to confront his accusers). The court stated that the California Supreme Court in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) defined the parameters for a substitute coroner's testimony.  In that case, the Supreme Court held that statements in an autopsy report describing the condition of the murder victim's body were not testimonial under the Sixth Amendment.  (*Id.* at pp. 617–621.)  Based on this case, the trial court found that Dr. Djabourian's testimony of the objective facts about the condition of C.B.'s body, facts he derived from the autopsy report, did not violate defendant's confrontation right under the Sixth Amendment.[9]  The court did not expressly rule on defendant's hearsay objection under state law.

We agree with the Attorney General that defendant has forfeited this hearsay claim on appeal.  "'[F]ailure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure

---

[9]      We address defendant's Sixth Amendment challenge in the next section.

14

deprives the trial court of the opportunity to correct potential error in the first instance.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 143; *People v. Ramirez* (2006) 39 Cal.4th 398, 472; *People v. Morris* (1991) 53 Cal.3d 152, 195 [defendant forfeited appellate challenge to admission of testimony by failing "to press for" a ruling "until he obtained one"], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  Defendant's reply brief does not address, and therefore implicitly concedes, the forfeiture issue.

IV.    *Sixth Amendment Right to Confrontation*

Defendant further asserts that Dr. Djabourian's statements were testimonial, therefore violated his Sixth Amendment right to confrontation.

The admission of testimonial statements by a nontestifying witness without a prior opportunity for cross-examination violates the defendant's right to confrontation under the Sixth Amendment.  (*Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*).)  This right to confrontation "bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 580–581; accord, *Crawford, supra*, at p. 68.)  A testimonial statement has two critical components.  "First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in

some fashion to a criminal prosecution."[10] (*Dungo, supra,* 55 Cal.4th at p. 619.)

Defendant contends the primary purpose of an autopsy report is for criminal investigation and the formality requirement was negated by *People v. Sanchez* (2016) 63 Cal.4th 665.

We find *Dungo, supra,* 55 Cal.4th 608, as previously mentioned, instructive. There, our Supreme Court considered whether a pathologist may testify about statements in an autopsy report prepared by another, nontestifying pathologist. The court held factual observations about the condition of the victim's body, made by a nontestifying pathologist and recorded in an autopsy report, were not testimonial because they lacked formality and criminal investigation was not the autopsy's primary purpose. (*Id.* at pp. 619–621.) While defendant argues the primary purpose of the autopsy is for use in criminal investigations, this contention is directly contrary to the holding in *Dungo.* Moreover, contrary to defendant's assertion, our Supreme Court in *Sanchez* did not abandon the formality requirement, and in fact utilized it in assessing whether a statement was testimonial. (See 63 Cal.4th at p. 694 [analyzing police reports], pp. 696–697 [analyzing a STEP notice].)

Therefore, Dr. Djabourian's testimony relaying the contents of the autopsy report did not violate defendant's confrontation rights.

---

[10]  Our Supreme Court has noted that "'[a] comprehensive definition of the term "testimonial" awaits articulation'" by the United States Supreme Court. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398.)

16

V.    *Pitchess Motion*

The trial court granted defendant's *Pitchess* motion for discovery of any complaints in Detective Ross's personnel records relating to his credibility. The trial court held an in camera hearing and thereafter stated, "there was nothing that was discoverable or relevant to this particular case." On appeal, defendant requests that we review the sealed transcript of the in camera hearing to determine whether the trial court abused its discretion in concluding there was no relevant discoverable information. As requested and required, we have done so. (*People v. Prince* (2007) 40 Cal.4th 1179, 1284–1286; *People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1232.) We see no abuse of discretion by the trial court.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, J.

WE CONCUR:

CURREY, P. J.

COLLINS, J.

17